# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39717**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Brandon M. HORNE**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 27 May 2021

———————————

*Military Judge:* Mark F. Rosenow.

*Approved sentence:* Dishonorable discharge and reduction to E-4. Sentence adjudged 7 December 2018 by GCM convened at Fort George G. Meade, Maryland, and Joint Base Anacostia-Bolling, District of Columbia.

*For Appellant:* Major Mark J. Schwartz, USAF; Carol A. Thompson, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Peter F. Kellett, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, LEWIS, and D. JOHNSON, *Appellate Military Judges*.

Senior Judge LEWIS delivered the opinion of the court, in which Judge D. JOHNSON joined. Chief Judge J. JOHNSON filed a separate dissenting opinion.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

LEWIS, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault of JC[1] by causing bodily harm in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The court-martial sentenced Appellant to a dishonorable discharge and reduction to the grade of E-4. The convening authority approved the adjudged sentence.

Through counsel, Appellant raises five assignments of error:[3] (1) whether trial counsel and the special victims' counsel (SVC) created an appearance of unlawful influence by interfering with the attempt by the Air Force Office of Special Investigations (AFOSI) to interview JC's spouse; (2) whether Appellant's conviction on a theory of sexual assault that was not charged violated his right to due process; (3) whether the military judge abused his discretion by allowing irrelevant evidence of JC's level of intoxication; (4) whether the evidence is legally and factually insufficient; and (5) whether the military judge erred by precluding cross-examination of JC under Mil. R. Evid. 412 regarding other sexual behavior with Appellant.[4]

In addition, Appellant personally requests this court consider 16 issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), some of which overlap with the assignments of error. The issues include: (6) whether the staff judge advocate's addendum failed to adequately address legal errors and provided incomplete advice; (7) whether the mandatory dishonorable discharge is cruel and unusual punishment under the Eighth Amendment,[5] given the specific employment implications; (8) whether the military judge erred in denying a motion to suppress Appellant's blood alcohol content results; (9) whether the military judge erred in denying a defense mistrial request or failed to grant other meaningful relief in order to accurately frame the impact of JC's

---

[1] JC was an active duty member of the Air Force throughout the relevant period of time, including during Appellant's trial.

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Military Rules of Evidence, and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] We reworded the assignments of error and the issues personally raised by Appellant.

[4] The trial transcript, appellate exhibits, and briefs addressing this issue were sealed pursuant to R.C.M. 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

[5] U.S. CONST. amend. VIII.

level of intoxication on her alleged lack of consent; (10) whether the AFOSI erred by failing to adequately obtain an evidence extraction of JC's phone; (11) whether the military judge's Mil. R. Evid. 412 ruling restricted Appellant's Sixth Amendment[6] right to confront JC through cross-examination; (12) whether the conviction was factually and legally insufficient for additional reasons; (13) whether the military judge erred in denying the motion for mistrial based on unlawful command influence or unlawful influence; (14) whether the AFOSI erred in failing to conduct an interview with JC's husband; (15) whether absent witnesses contributed to an unfair trial; (16) whether the AFOSI erred in conducting their investigation; (17) whether the AFOSI erred by not collecting and/or testing evidence mentioned by JC and in the Government's possession; (18) whether the AFOSI erred by sharing false information with JC which caused unreasonable fear, panic, and inaccurate reporting; (19) whether trial counsel engaged in prosecutorial misconduct; (20) whether there was bias in the investigation; and (21) whether substantial and consistent errors cumulatively resulted in an unfair trial.

Regarding issues (6), (8)–(10), and (13)–(20), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Regarding issue (7), we find the issue to be without merit for the reasons we announced in *United States v. Rita*, ___ M.J. ___, No. ACM 39614, 2020 CCA LEXIS 238, at \*5–7 (A.F. Ct. Crim. App 17 Jul. 2020), *rev. denied*, 80 M.J. 363 (C.A.A.F. 2020).

We combine assignment of error (4) and issue (12) though we will limit our assessment of legal and factual sufficiency to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

We combine assignment of error (5) and issue (11). We assume without deciding that the military judge's ruling limiting the cross-examination of JC was influenced by an erroneous view of the law and was an abuse of discretion. However, we find the assumed error was harmless beyond a reasonable doubt so relief is not warranted.

Regarding issue (21), we find no relief warranted for cumulative error. "The implied premise of cumulative error doctrine is the existence of errors, 'no one perhaps sufficient to merit reversal, [yet] in combination [they all] necessitate the disapproval of a finding' or sentence." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). We do not find the errors identified in this opinion, when considered together, necessitate the disapproval of the findings or sentence.

---

[6] U.S. CONST. amend. VI.

Additionally, we consider the issues of facially unreasonable post-trial and appellate delay. We find no error materially prejudicial to Appellant's substantive rights and affirm the findings and sentence.

## I. BACKGROUND

### A. Events Before the Trip to Germany

The offense in this case occurred on 11 July 2017 while Appellant and JC were on a temporary duty assignment to Germany. The parties at trial went to great lengths to elicit evidence that would portray Appellant and JC in particular ways prior to the trip to Germany. For example, the Government questioned witnesses about the nature of Appellant's and JC's prior interactions which tended to show Appellant was attracted to JC. The Defense attempted to show that JC was aware of Appellant's interest in her before the trip and had been told that she might have sent Appellant mixed signals. The Defense also attempted to show that JC knew she was pregnant before the trip. The Defense's theory was that JC drank large amounts of alcohol, despite knowing she was pregnant, had consensual sexual intercourse with Appellant, then saw blood on the bedsheets afterwards and concluded she was having a miscarriage. To support this theory, the Defense tried to show that JC concealed prior alcohol use from her husband and that her husband had been cheated on by his ex-wife. Given these circumstances, some background on the events prior to the Germany trip is necessary before explaining what the evidence showed occurred on the night of the offense.

In early 2017, Appellant and JC were members of the same unit and stationed at Fort George G. Meade, Maryland. JC and Appellant worked in the same office, interacted on a regular basis, and got along well. JC knew that Appellant was married. JC was also married. JC's husband, Technical Sergeant (TSgt) BC, was also stationed at Fort Meade, but in a different unit.

Staff Sergeant (SSgt) CM was a male co-worker and a friend of JC's. JC and TSgt BC attended church with SSgt CM and his wife and at times the four of them would go to lunch afterwards. SSgt CM did not know Appellant very well but observed him interacting with JC on a daily basis. SSgt CM testified Appellant "exhibited some attraction" to JC but it was "all nuanced" and not "overt." SSgt CM found it "important enough" to mention it to JC. SSgt CM testified that JC's response was that she had not noticed it so SSgt CM told JC it was something she should pay attention to. SSgt CM recalled telling JC that she might be sending Appellant "mixed signals." SSgt CM explained that JC's "a socially graceful person. She's genuinely likable by most people, I believe, so some people may interpret those signals differently or incorrectly, even." SSgt CM stated that he did not see JC display any of the same behavior towards Appellant that Appellant displayed towards JC.

4

JC testified that she recalled a conversation with SSgt CM where she was told Appellant was looking at her inappropriately and saying things about her with inappropriate connotations. JC explained that she thanked SSgt CM and told him that she did not think Appellant meant anything by it. JC did not recall SSgt CM telling her that he was concerned that she was giving Appellant mixed signals, only that Appellant was acting inappropriately.

In February or March 2017, JC and SSgt CM went on a temporary duty assignment to Georgia with other members of the unit. SSgt CM remembered JC having a beer at dinner and that JC asked SSgt CM not to say anything to her husband about it. JC recalled the temporary duty assignment to Georgia with SSgt CM. However, she did not recall asking SSgt CM not to tell TSgt BC that she drank a beer.

SSgt CM also testified about how JC felt towards TSgt BC's ex-wife. SSgt CM explained that as far as he understood it, JC "kind of held a lot of animosity" toward her husband's ex-wife and that it related to the ex-wife's infidelity which had hurt TSgt BC. SSgt CM testified that JC "never went into depth" and he "never asked questions" but the infidelity weighed heavily on TSgt BC, and JC "absolutely" wanted to be a good spouse. JC confirmed in her testimony that TSgt BC had been married before and that the infidelity of TSgt BC's ex-wife was an issue in that marriage. JC did not recall telling SSgt CM about the infidelity of TSgt BC's first wife or that she wanted to be a "good wife" because of this.

In April 2017, JC experienced a miscarriage approximately six weeks into a pregnancy. In her testimony, JC denied that "shortly after" the miscarriage she and TSgt BC began trying again to get pregnant or that she told SSgt CM that she was actively trying to conceive. JC testified that she "thought" she was going to start her menstrual cycle while she was in Germany, and she could have been starting it "maybe a day late."

However, SSgt CM agreed in his testimony that sometime prior to the Germany trip JC indicated to him that she "thought" she was pregnant. According to SSgt CM, JC did not say why, and he did not ask questions. SSgt CM knew that JC and TSgt BC were "hoping to have a child" and "they had the misfortune of a miscarriage earlier in that year, and so she was very excited." SSgt CM thought, "[S]he just wanted to express that to me, since she was friends with my wife and [me]."

The Friday before the Germany trip, JC, Appellant, and another SSgt from the office went to a unit going away. JC was running late as she wrapped up mission-related work. JC testified that Appellant said to her, "[I]f you don't hurry your cute little butt up, I'm going to pick you up and I'm going to carry

you out of the squadron." JC testified the comment took her by surprise and it was "a little strange" but she did not think too much of it.

JC was also asked if Appellant made a comment about her vehicle that seemed out of the ordinary to her. JC described a time where she was on a temporary duty assignment with Appellant where he told her that he remembered her from Goodfellow Air Force Base (AFB), Texas. JC explained that she was at Goodfellow AFB for three months in 2013. JC remembered Appellant telling her that he remembered her because she "was a cute blond girl driving a black two-door BMW." JC did not know that Appellant had been at Goodfellow AFB at the same time she was. She thought his comment was odd at the time, but she did not think too much about it. JC did not testify as to when Appellant made this comment to her.

## B. Events in Germany

In July 2017, JC, Appellant, SSgt CM, and two female members of the same unit, Senior Airman (SrA) CB[7] and LC[8] travelled to Germany. Everyone stayed in the same off-base hotel with the exception of SSgt CM; he stayed in a different hotel nearby. JC and Appellant had rooms on the third floor of the hotel; SrA CB and LC had rooms on the fourth floor. The group arrived in Germany on 9 July 2017. After checking in to their hotels, the group—except for SSgt CM—had dinner together at a restaurant in a nearby town. When they returned to the hotel, SrA CB and LC returned to their rooms while JC and Appellant had a drink together at the hotel bar. After one drink, JC and Appellant each returned to their respective rooms.

On 10 July 2017, the group spent most of the duty day at Ramstein Air Base (AB). They returned to their respective hotels in the afternoon. In the evening, JC, Appellant, SrA CB, and LC again went out for dinner and then to a "beer garden." JC was wearing jeans and a tank top and had a coat with her. Everyone in the group was drinking alcohol. For her part, JC drank a beer with dinner and another at the beer garden. She described the beers as "full glasses, very large glasses." The group then returned to the hotel and began playing a drinking game on the back patio. On the back patio, Appellant got and paid for one of JC's drinks, a double shot of vodka and cranberry mixed drink. JC testified this drink was in "a tall glass as well." At that point, JC "felt fine" and was having "a great time." JC went back for a refill of the same drink Appellant had bought her.

---

[7] SrA CB was a staff sergeant (E-5) at the time of Appellant's trial.

[8] LC was an active duty member of the Air Force throughout the relevant period of time, including during Appellant's trial.

While the group was on the back patio, JC sent a text message to her husband that read: "Falling asleep… I love you babe.. text me in the morning[.]" LC saw the message and testified she "kind of called [JC] out on it because [LC] thought it was strange." LC testified that JC's reply to her was that "it was better this way." JC testified that after she sent the text to her husband, the group was "continuing on and having a good time" so she decided to stay up. JC remembered ordering a third double shot of vodka and cranberry mixed drink and thought she might have had some beer though she was "not 100 percent sure."

At some point, the hotel closed the back patio, so the group moved to the front patio outside the main entrance to the hotel.[9] There they continued drinking alcohol and socializing among themselves, as well as with several male hotel guests who joined the group on the front porch. JC recalled this in general and was "sure we had conversations with them, socializing" but JC did not recall any details. SrA CB did. SrA CB recalled the male hotel guests having a bottle of vodka which they shared, and that JC took "two or three shots" and Appellant had about the same. SrA CB recalled JC speaking to the male guests in French and in English with a French accent, and moving to sit closer to them. SrA CB opined that it looked like JC was seeking attention from others and appeared to be intoxicated, like everyone else.

LC testified about how close she was to the others in the group and whether she had seen any of them drunk before. LC was close friends with Appellant and was confident traveling with him because they had traveled before. LC had seen Appellant drunk before and stated he would become quiet when he drank. LC worked in the same office with JC, but they did not socialize outside of work. LC only knew SrA CB from this trip.

LC also testified about how intoxicated everyone was and to JC's behavior on the front patio. LC recalled that she and SrA CB were "clearly less intoxicated" than JC. LC also testified that she knew Appellant "was drunk." Regarding JC's alcohol consumption LC estimated that JC had a total of "at least three, possibly four" double vodka cranberry drinks. LC believed that JC had "at least three shots of the vodka" on the front patio with the male guests.[10] Regarding JC's behavior, LC agreed that JC said some nonsensical things on the front patio and was "very engaged with the strangers" and spoke with an accent at one point. LC had never seen JC drunk before and it took her a little

---

[9] The front patio area was video recorded by a hotel security camera. The security footage is in the record of trial but was not admitted into evidence. Two witnesses testified to small portions of the security footage.

[10] A witness who viewed the front patio security footage testified that it showed Appellant and JC doing multiple shots of alcohol and consuming other "beverages."

while to realize how drunk JC was. LC remembered JC being "very, very friendly with everybody" and "[u]ninvited, she came over and sat on [her] lap." LC was uncomfortable and then JC turned around and straddled LC.

At one point SrA CB left the front patio for the hotel lobby restroom. JC also entered the restroom while SrA CB was in it. SrA CB testified that JC told her about a miscarriage that JC had and that "[she] and her husband were trying for children and that she was a day late for her period." SrA CB had never had a personal conversation with JC like this and remembered JC was crying. SrA CB recalled LC coming into the bathroom to find them because the two had been gone for a while. LC testified that she went to check on SrA CB and JC to see if they were okay because they had been gone for a while.

Once inside the bathroom, LC explained that JC was crying and pretty upset, and SrA CB was trying to console JC. LC believed JC was intoxicated because her speech was slurred, she had exhibited a lot of back and forth mood swings, and she was "a little wobbly." Regarding JC's mood swings, LC explained that JC seemed "really happy" while on the front patio, "really sad while she was in the bathroom," and "happy again" when she came back to the front patio.

While the three women were still in the bathroom, LC recalled Appellant sending "a text or Facebook message" to the group asking if everything was okay. LC also testified that Appellant had JC's phone because JC left it sitting on the coffee table when she went to the bathroom. The group had been using Facebook to communicate while in Germany and a series of messages correspond to when JC and SrA CB were in the bathroom and when LC joined them. At 0156 hours, LC sent a group message, "Yo, you guys good?"[11] Appellant replied, "I'm good" and asked, "How are the rest? [tagging SrA CB]." LC responded, "All good!" Appellant then sent eight messages: (1) "Are you sure;" (2) "call [tagging JC's account] [JC's last name];" (3) "and [tagging SrA CB's account];" (4) "I want to make sure they are safe b before turn in;" (5) "So me. Proof;" (6) "I'd what I'm saying;" (7) "What room is [tagging JC's account] [JC's last name];" and (8) "I have her phone." Appellant also sent JC a private message on Facebook at 0157 hours that read "Have you gone to bed."[12]

Around 0245 hours, based on JC's behavior with the male hotel guests, LC told the group it was time to go to bed. According to a witness who reviewed the front patio's security footage, when the group left the patio Appellant was

---

[11] These messages are replicated with errors. Identifying names and account names have been removed.

[12] JC testified she did not see this private message from Appellant until after the police were called when she was at a German hospital.

carrying a beer bottle and JC was not. LC testified that once the group was in the elevator JC said "she was coming to sleep" in LC's room. LC told JC to go to her own room. SrA CB was not asked whether she recalled this elevator conversation between LC and JC. According to SrA CB and LC, JC and Appellant exited the elevator on the third floor and they proceeded to their respective rooms on the fourth floor.

## C. Upstairs in the Hotel

According to the hotel's guest-room door-access logs, JC's room key was used to access her third floor room at 0252 hours. The access logs show no corresponding entry by Appellant's room key into his room.

JC testified she did not remember leaving the patio or being on the elevator, but she did remember being alone in her room preparing to go to bed by "setting [the] alarm on [her] phone for the next day; changing into pajamas; that sort of thing." JC described that her normal bedtime routine also involved removing her diamond wedding ring because it had a tendency to scratch her at night and sometimes her fingers swelled at night. JC did recall hearing a knock on the door while she was in the middle of putting on her pajamas. JC remembered grabbing a pair of black sweatpants and putting them on before answering the door. JC was still wearing her tank top from earlier in the night. JC had no memory of leaving her room or visiting LC's room on the fourth floor at any time with Appellant.

According to LC's cell phone log, at 0252 hours, LC received an incoming call from Appellant that lasted for 18 seconds. LC testified that this call was "just before" Appellant and JC came to her room. When LC opened the door, she saw JC and Appellant standing in the hallway "kind of giggling." JC asked for her "badge" that LC was keeping in her backpack. Meanwhile, according to LC, Appellant was standing outside the door wobbling a bit. LC gave JC her badge and told them to go to bed. LC did not think JC looked uncomfortable nor did LC see JC or Appellant display verbal or physical signs of affection towards each other. LC recalled JC saying that Appellant was "very drunk" but that JC was "giggling" about it. LC did not recall whether Appellant or JC was carrying a beer bottle. LC was not asked if she remembered whether JC was wearing jeans or black sweatpants. LC was also not asked if she recalled whether JC was wearing her diamond wedding ring or not.

At 0301 hours, Appellant's room key was used to attempt to access JC's room. This resulted in an error code which was shown on the guest-room door-access log for JC's room.

LC testified JC and Appellant came to her room a second time, approximately eight minutes after the first time. JC and Appellant again stood in the hallway and JC asked LC "for the same badge that was in her hand." LC told

JC that she had the badge in her hand. JC looked "surprised" and "looked at her hand" and "looked confused, very disoriented." LC agreed that JC's demeanor had changed "a little bit" from the first visit. Now, JC "was kind of out of it, like almost like sleep walking." LC testified that "both looked drunk, but it was like less of a happy drunk and more of a tired drunk." LC told them to go to bed and that she "was very uncomfortable with them being there." LC explained that JC and Appellant "didn't seem to be uncomfortable with each other, but I was, frankly pushing them—like I was upset that they were there." LC was not asked whether JC was wearing jeans or black sweatpants or whether JC was wearing her diamond wedding ring or not.

At 0310 hours, JC's room key was used to access her room.

**D. Inside JC's Room**

As noted above, JC never recalled leaving her room or visiting LC's room. JC only recalled Appellant entering her room one time and this entry occurred when JC heard a knock on her door when she was changing into her pajamas. As JC never recalled leaving her room, she was unable to testify exactly when she changed her clothes—before or after the two visits to LC's room with Appellant. JC did remember answering the door, which opened inwards and Appellant "pushed" her through the door, "back into" the room, and "onto [her] bed." JC recalled Appellant held her arms over her head as he pushed her through the door. JC was asked by the senior trial counsel whether she recalled if there was anything in Appellant's hands and her response was "I was frozen. I didn't worry about what was in his hands." JC described that Appellant was pushing her around her shoulders or her arms and walking her back. JC explained "I'm drunk, so it's not like I'm hard to push back—and he shoves me onto the bed." Once on the bed, JC stated that Appellant wrapped his hands around her wrists but she did not remember how much force he used.

JC testified that after Appellant pushed her down onto the bed, he started taking her clothes off. JC thought Appellant was "on his hands and knees right above [her]." JC recalled "just rolling back and forth trying to get away" as Appellant pulled off her top. JC testified that Appellant took off her black sweatpants and she "was still rolling." JC did not know if she was screaming, but she was "screaming inside." JC explained that she was rolling to try and get away from Appellant but she was not able to because he was bigger and stronger than her. JC recalled Appellant "just threw" her clothes after they were removed. JC also described her clothes being "tossed" by Appellant "to the floor."

At trial, JC identified the black sweatpants and the tank top she was wearing which were admitted into evidence. JC also identified a bra that she wore earlier in the evening but she could not recall whether she had been wearing

it right before the assault. Photographs of each of these items of clothing were substituted in the record of trial. The German police also photographed where these items of clothing were found in JC's room. We describe those details below.

JC testified that after her clothes were removed by Appellant, she remembered Appellant being positioned "over the top" of her and kissing her while she turned her head from right to left. JC was turning her head in this manner to "get away from him kissing" her because she "didn't want it." Appellant smelled like cigars. JC testified that she "passed out" and that when she was "coming back to" she saw Appellant's face between her legs. JC was asked what Appellant was doing, and she responded "oral sex." JC testified that she "was trying to figure out what was happening."

JC was then asked what Appellant did next. According to the transcript, JC responded,

> Pushing his way inside of me. I remember crying out that I love my husband and I'm married. He said "I don't care." I said, "You're married," and [he said] "I don't care." I even said I could be pregnant, and he didn't care. I passed back out again. [The witness was emotional.]

JC agreed that Appellant had inserted his penis in her vagina. JC explained that Appellant's body was on top of hers and she was laying on her back in the middle of the bed. Once Appellant penetrated her, JC recalled thinking "rape; I don't want this; I didn't ask for this; why?"

JC testified that she did not recall "how long [Appellant] did it" and she did not know "what else he did" but that it "felt like a lifetime" and she "blacked out after it." JC recalled that she "woke up" and Appellant "was at the foot of the bed getting dressed." JC noticed there was blood right underneath her pelvis on the bed linens and thought "[r]ape and it was because he forced his way inside me." JC covered herself with the sheet because she did not want him to look at her while she was naked. Appellant said "sorry [JC's last name], want me to get somebody?" JC asked for Appellant to get SrA CB.

**E. Subsequent Events**

SrA CB was asleep in her room when she woke to someone knocking on her door. SrA CB did not recall what time it was when she heard the knocking but when she answered the door Appellant was standing there looking "frazzled" and "scared." Appellant told SrA CB, "[JC] needs you." SrA CB asked "why" but Appellant just repeated that JC needed her and did not give any reasons. SrA CB testified that she went to JC's room alone and Appellant did not follow her.

At 0338 hours, Appellant sent the group a Facebook message "come pic up [tagged JC's account] phone at [Appellant's room number]." It is unclear whether this message was sent before Appellant woke up SrA CB or after. The hotel's guest-room door-access logs show Appellant's room key accessed his room for the first time on 11 July 2017 at 0344 hours. The last time Appellant's room key had been used to access his room was 10 July 2017 at 2223 hours.

When SrA CB arrived at JC's room, JC answered the door "holding a blanket over herself." JC was not clothed underneath the blanket and was crying. SrA CB asked what happened and JC stated that Appellant "had raped her." SrA CB saw that the wedding ring and a silver thumb ring that JC had worn earlier in the evening were now on the desk in JC's hotel room. SrA CB attempted to comfort JC and asked if JC wanted her to get LC. JC said she did, so SrA CB left to get LC. SrA CB took JC's room key so she could get back into JC's room.

LC recalled being woken up by SrA CB and going to JC's room. At 0347, the hotel's guest-room door-access logs show JC's room key was used to access JC's room. SrA CB agreed that she used JC's room key to get back into the room.

After entering JC's room, LC described JC as "completely nude," "sitting at the head of the bed with a blanket wrapped around her" which covered her. JC was crying. SrA CB had a similar recollection of where JC was located. LC recalled JC's wedding rings "were off sitting on her bedside table." LC tried to calm JC down. During this time, SrA CB recalled JC pointing out that there was blood on the bed and that she was not drunk. SrA CB thought "everyone was drunk." LC did not recall JC saying she was not drunk at this point.

SrA CB testified that she and LC "asked [JC] if she would like [them] to notify the authorities." JC said "Yes" so SrA CB called the front desk and asked them to call the police. LC testified that she went to Appellant's room. No evidence was presented on what the two of them discussed. However, LC testified that she did not retrieve JC's phone from Appellant's room even though Appellant had sent the group Facebook message that he had JC's phone and gave his room number. LC stated that SrA CB was the one who retrieved JC's phone from Appellant's room, though SrA CB never testified to doing so. At 0354 hours, LC sent a group Facebook message "what room are you in?" in which SrA CB responded with JC's room number. LC explained that she sent the group Facebook message because she was "just trying to get back to [JC]'s room."

LC testified that she then returned to JC's room and this is when JC stated that she was not drunk. LC explained how this occurred:

> I told her, "Just tell us the truth. I know you're very drunk, but just try to tell us exactly what happened," and she said, "I'm not drunk at all," and she seemed very surprised that we said that -- [SrA CB] and I.
>
> . . .
>
> . . . I just tried to very calmly and directly ask her what happened. She kept saying, "You don't believe me, you don't believe me, just look at the blood on the sheets."
>
> . . .
>
> She was rattling that her husband would think that she's a whore and that --she just seemed upset with that --saying that I didn't believe her.

German police investigators were notified and arrived at the hotel. Among the first German investigators to arrive was Mr. HE, who testified at Appellant's trial with the assistance of a translator even though he spoke and understood English. Mr. HE testified that he was directed to JC's room and found the door was propped open with a backpack. Two women were inside, JC and SrA CB. JC was sitting on the right side of the bed, bent over with a cover pulled up to her chest. SrA CB was sitting next to JC. It appeared to Mr. HE that JC had no clothes on and he described her demeanor as "tense and she looked as if she had been crying." Mr. HE recalled JC saying—before he asked any questions—that "I didn't want to do it, I'm married." Mr. HE found this statement "very peculiar."

Mr. HE questioned JC and described her as "very whiney, almost hysterical, and she could not answer any questions without having a fit of tears." After questioning, Mr. HE asked JC to move so the room could be documented and was told that JC did not have any clothes on. Mr. HE and his male colleague left the room and directed JC not to change anything in the scene and to put on fresh clothing.

When Mr. HE returned, the bedding and JC's clothes were photographed and collected. For trial, four arrows were added to one picture of the "cover" of the bed, to identify what Mr. HE described as "red stains on the cover." In this same picture JC's black sweatpants are partially visible at the bottom of the "cover." Mr. HE described the black sweatpants as "folded inwards, nested," "on top of the cover." JC's bra and tank top were photographed on the floor, next to the desk, underneath a foldable hotel luggage rack. Mr. HE described that one half of the bra was "on top of the tank top, and the other half was folded inside the middle of the tank top." According to Mr. HE, the bra and tank top were "not neatly folded together." The bed sheet was collected and pictures in the record of trial show two areas of discoloration. Mr. HE did not

recognize the bed sheets specifically, but he knew that he collected them and they had "red substances" on them.

Mr. HE also noticed there was a beer bottle next to the sink in JC's bathroom. In addition, the toilet seat was "open" which Mr. HE "found unusual" because "a woman was in the room or was assigned to the room and . . . to urinate . . . [men] lift the top of the toilet." The beer bottle and the toilet were photographed and those pictures were also admitted into evidence.[13]

During the collection of the evidence, in Mr. HE's opinion, JC was "very fragile," and "was having problems with her breathing and kept slumping more in her chair." Mr. HE testified that JC wanted an ambulance to transport her and he made the decision to call one. A portable breath test was administered to JC and Mr. HE observed the result as "2.14 alcohol per mil." Mr. HE did not know how that translated in blood alcohol content.[14]

JC and SrA CB did not testify about many of the details surrounding their interactions with the German police investigators. SrA CB recalled the German police investigators arriving and that they took pictures and collected things and there was a language barrier. JC recalled waiting for the police with SrA CB who retrieved her a pair of shorts and a tank top to wear. JC recalled the German police arriving and collecting and bagging items. JC recalled having to urinate and being told she was not allowed to wipe. JC testified that she felt gross and dirty. JC recalled that military police arrived later and made sure she was okay and told her they would meet her at the hospital.

Sergeant (SGT) DT, one of the two military policemen from the United States Army who responded to the hotel, testified. SGT DT testified that when he and his partner, Specialist W, arrived, SrA CB, JC, and a German police investigator were in the room. SGT DT described JC as "sitting on a chair, kind of balled up on the chair, kind of in a fetal position with a blank look on her face." SGT DT said JC was wearing a sweatshirt and some type of pants. JC was very reserved and was not saying anything to anyone. SGT DT learned all of the evidence had been collected. SGT DT escorted JC to the ambulance. SGT DT recalled that the German police investigators "walked up to, I think, [SrA CB]'s room to grab stuff out of her room." SGT DT went with JC and described that she "grabbed onto [his] left arm very tightly and asked if [he] was going to the hospital with her, because she felt comfortable with a military police, an

---

[13] The beer bottle was still in the custody of military authorities at the time of trial. It was never fingerprinted and there was no attempt to collect a DNA sample from it.

[14] During pretrial motions, Dr. ES, the Government's forensic toxicologist at that time, testified this was "equivalent to a .22 blood alcohol concentration."

American soldier, going with" her. SGT DT told JC he would meet her there because he had to collect other information from witnesses.

Mr. HE rode in the ambulance with JC. During the ride, JC was being questioned by the ambulance assistant about whether she was pregnant and Mr. HE heard this conversation. Trial counsel was allowed to question Mr. HE about this subject after a defense objection was withdrawn:

> [Trial Counsel]: Sir, I'm going to ask you one more time my last question. When you traveled to the hospital with [JC], did you hear her ever say why she thought she was pregnant?
>
> [Mr. HE]: Yes, I did hear that.
>
> [Trial Counsel]: Did she say -- she said she thought she was pregnant, correct?
>
> [Mr. HE]. She said she was pregnant.
>
> [Trial Counsel]: Did she give a reason why she thought that?
>
> [Mr. HE]: No, she did not say, and it was about the status of her health. It's always asked by people in—by the assistants in the ambulance for the status of your health.

At the hospital, beginning at 0630 on 11 July 2017, Dr. K, a German gynecologist, performed a sexual assault forensic examination (SAFE) on JC. Dr. K's SAFE report was prepared in German and was translated into English for trial; both versions were admitted into evidence. Dr. K and JC conversed in English during the SAFE. SrA CB sat in at JC's request but did not testify to what was said by JC.

The SAFE report provides a "[b]rief report of the circumstances" from JC as written by Dr. K:

> We were four (all coworkers) (3 women, 1 man) who had some drinks together at the hotel (Meriott) [sic] during a dinner. ([JC] drank 3 Vodka Cranberry). Afterwards at approx. 2:45 AM [JC] and 1 coworker returned to their rooms on the 3rd floor. [Appellant] followed [JC] to her room. He harassed her and had nonconsensual intercourse with her. She could only defend herself a little since he was significantly bigger and stronger than she was. He finally left the room and informed [SrA CB]. He told her[15] he did not do anything [JC] did not want to do. [SrA CB] finally called the police.

---

[15] The SAFE narrative does not specify whether this statement was made to SrA CB or JC.

The SAFE report has a section on pregnancy and the "Possible" block is checked. The date of JC's first day of last menstruation is annotated as 4 June 2017. JC's state of awareness was marked as "clear;" her thought process was "structured;" her mood was "sad" and her contact was identified as "shy;" her memory was "inconspicuous;" her drive "passive;" and her orientation "disordered." The SAFE report stated that during the event: (1) vaginal penetration occurred with ejaculation and without a condom; (2) there was holding by the wrists; (3) clothing was "pulled down;" and (4) JC's "face, chest, vagina" were "kissed, licked, [or] suckled" though the report does not specify which of these three things occurred. The SAFE report stated that after the event JC had (1) pain in her lower abdomen; (2) rinsed her mouth; and (3) urinated. Dr. K noted no external injuries. Dr. K collected a total of ten swabs from JC's external genitals and vagina. The SAFE report of the vaginal exam stated Dr. K's findings as "no bleeding. Vulva/Vagina clean, no signs of injuries visible." JC's weight was 110 pounds during the SAFE. Her prior alcohol consumed was listed as three vodka and cranberry juice, each drink approximately 300 ml, though Dr. K answered "no" to whether the examining physician had the impression that JC was under the influence of alcohol, drugs, or medication.

On 24 July 2017, Dr. K produced a three-page "Medical Report" in German which was also translated into English. Both were admitted into evidence. This report contains additional details from the examination. First, it stated that "[r]egarding the act of the circumstances and the level of violence, the patient did not provide specific details." Second, it stated JC confronted Appellant about the act and he stated "he did nothing that she didn't want either."[16] Third, the report stated that JC "demanded of [Appellant] to inform her female colleague, which he did and then proceeded to his room." Fourth, the report described JC as in a

> residual alcohol state at this point. Nevertheless, she can provide specific details of the time and duration of the assault. The patient describes the sequence of the act rather vaguely and only provides specific details upon further questioning. Overall, the patient seems troubled. She is upset and cries while describing the incident.

Fifth, and finally, the report contains a reference that JC "does not practice safe sex due to having the desire for children/ a child."

A video deposition of Dr. K was admitted into evidence at Appellant's trial. Dr. K had performed "up to 20" SAFEs and agreed it was not her primary work. Dr. K explained that her clinic would provide treatments for pregnancy, but

---

[16] Dr. K appears to be clarifying the narrative in JC's SAFE report.

that JC did not request the morning-after pill. Dr. K remembered JC saying she planned to get pregnant or might be pregnant. Dr. K explained that her hospital did not provide precautionary testing for sexually transmitted diseases. Dr. K confirmed that no one had told her that JC was under the influence of alcohol and that, to her, JC did not appear to be under the influence of alcohol. Regarding JC being "disordered" Dr. K explained that JC was not oriented to time because Dr. K did not think she had a watch with her. Dr. K agreed that it was common not to see injuries in a SAFE. For the vaginal examination, Dr. K noted that she was familiar with the process of using blue dye to see injury fissures, but that her facility does not use that method so her observations of no injuries were with the naked eye. She described having "a little bit" of difficulty in completing a full visualization of JC's anatomy. Regarding JC's memory of the assault, Dr. K had the impression that JC did not have any gaps in her memory. Finally, Dr. K explained that blood was drawn from JC at 0820 hours. Dr. K never received the results of the tests of JC's blood. However, she was told after the examination by one of the German police that they had tested JC's breath, but she did not recall exactly what the results were.

In the afternoon of 11 July 2017, JC met with Dr. N, who at the time was an active duty United States Army major and family medicine physician stationed in Germany.[17] JC arrived with a victim advocate and shared that she had already gone to the German hospital, that she did not wish to have another sexual assault examination, but she "mostly" had concerns about medical care. JC told Dr. N that she was raped by a male in her unit, and she did not wish to rehash the entire story because she had done that already. JC did share that there was "penile/vaginal penetrated intercourse and no other penetration took place." JC was concerned about a possible pregnancy and harm to that pregnancy. Dr. N testified that JC

> had been trying to conceive with her husband and that she was late on period, to my best recollection about 37-days late[18] and she had been feeling a little bit nauseous even before the sexual assault and so she thought she could be pregnant and she was

---

[17] Dr. N separated from the Army prior to Appellant's trial.

[18] Dr. N testified that 37 days late meant JC's last menstrual cycle started on 4 June 2017 and that she received this information from JC. Dr. N noted that the SAFE report of Dr. K, which also had the same date listed, was not available to her at that time.

unsure if the German doctors had done a pregnancy test or considered that and so she desired a pregnancy test and to sort of be reassured that there was no threat to her pregnancy.

Dr. N performed a pregnancy test which was positive.[19] JC was told and Dr. N thought she was "both excited" and it "increased her . . . fear—she was sort of fearful during the whole encounter." After learning the results, according to Dr. N, JC started crying again and looked less confident and a little bit anxious. Dr. N opined that it seemed like this was the first time JC received positive pregnancy results. JC described to Dr. N that she saw blood on the sheets but that the bleeding had stopped. Dr. N noted that it is common to have some small amounts of bleeding in the first trimester of pregnancy. Dr. N was asked whether JC remembered the entire incident or entire event and responded, "I believe what she said was that she didn't lose consciousness."

At 1709 hours on 11 July 2017, JC was interviewed by AFOSI agents but the interview was not recorded.[20] Prior to interviewing JC, AFOSI agents had already retrieved the evidence that had been collected by the German police, visited the hotel, photographed the rooms, met with hotel staff, and retrieved the guest-room door-access logs. One of AFOSI's photographs showed a bottle of prenatal vitamins in JC's bathroom. Special Agent (SA) LJ from the Ramstein AB AFOSI detachment testified about this evidence at trial and also explained what JC said during the interview regarding a few areas where the evidence was in conflict. SA LJ explained that JC said (1) she had been trying to get pregnant with her husband; (2) that the beer bottle in her room was not JC's; (3) that JC had fallen asleep when she heard a knock on her door; and (4) that Appellant got undressed. SA LJ testified that JC did not mention setting her alarms and was not sure if the "oral intercourse" was pre- or post-vaginal intercourse.

---

[19] JC testified that Dr. N told her she was ten days pregnant. Dr. N explained when she did a qualitative pregnancy test she would use the first day of the last menstrual cycle to tell a patient how long she might be pregnant. Dr. N agreed that if JC told her that 4 June 2017 was the first day of her last menstrual cycle that JC was "close" to ten days pregnant.

[20] When given the option of having a second interview (this time recorded), or making a written statement, JC opted to make a written statement in September 2017, approximately two months after the alleged sexual assault, and to have her SVC review it before it was submitted. The SVC, Captain JP, suggested two changes to JC's initial draft of the statement: (1) that if JC felt the penetration of Appellant's penis, she should do her best to describe it as she detailed the situation; and (2) that the SVC would take out the phrase "without hint of concern or apology" when Appellant asked whether JC wanted him to get someone for her. Portions of JC's second written statement were admitted into evidence as a prior consistent statement.

Captain (CPT) MM, a United States Army nurse and sexual assault medical forensic examiner, performed a SAFE on Appellant and testified at Appellant's trial as an expert for the Government. His testimony covered both Appellant's examination and the process he would use in the SAFE of a female victim. CPT MM's full-body examination of Appellant revealed no visible injuries. CPT MM collected swabs from Appellant's genitals. Regarding female victim SAFEs, CPT MM testified, *inter alia*, that the presence or absence of vaginal bleeding or other injuries are not, in themselves, indicative of whether sexual intercourse was consensual. CPT MM also explained that "toluidine blue" is a stain that, when applied, can help highlight injury to tissue. It is only applied to external genitalia to highlight injuries that may not be able to seen with just the naked eye. CPT MM agreed more experienced examiners could potentially see injuries without using the dye. CPT MM also explained that the dye is recommended if there is injury that is believed to have occurred or if a patient notes pain during the physical head-to-toe assessment.

At trial, Dr. GJ testified for the Government as an expert in forensic toxicology. Based on JC's blood alcohol content as measured on the morning of 11 July 2017, Dr. GJ estimated that JC's blood alcohol content at the time of the alleged assault may have been in the range of 0.237 to 0.290 percent. On cross-examination, Dr. GJ explained that a person with blood alcohol content in that range could potentially walk, converse, participate in sexual intercourse, and "perform all their activities."

Forensic testing by the United States Army Criminal Investigations Laboratory identified the presence of semen on vaginal and cervical swabs taken from JC, as well as swabs of Appellant's genitals. Testing identified DNA profiles matching both JC and Appellant on the cervical swab from JC, and swabs from Appellant's genitals also contained DNA profiles matching JC and Appellant. Testing also identified a mixture of blood and semen on samples taken from the bedding, which contained DNA profiles matching JC and Appellant.

At trial, the Defense called Ms. MO, a sexual assault nurse examiner and sexual assault forensic examination program manager for the United States Navy, to testify as an expert in SAFEs. Ms. MO served as an expert consultant for the Defense and observed JC's trial testimony. Based on JC's description of the incident, Ms. MO testified she would have expected JC's full-body SAFE to reveal marks on her arms and wrists from Appellant holding her and abrasions, redness, and "potential" injuries in JC's genital area.

## II. DISCUSSION

### A. Unlawful Influence

#### 1. Additional Background

After the July 2017 incident in Germany, JC and her husband TSgt BC transferred from Fort Meade, Maryland, to Nellis AFB, Nevada. In October 2017, SA DM of the Nellis AFB AFOSI detachment received a lead from AFOSI agents at Ramstein AB to interview TSgt BC in relation to the investigation of Appellant. SA DM made contact with TSgt BC by calling JC's phone because that was the only phone number he was given. SA DM made contact with TSgt BC and made an appointment to interview him the following week.

Before the interview took place, SA DM received a call from Captain (Capt) JP, who was JC's SVC at the time. Capt JP told SA DM that the interview "needed to be cancelled" and that SA DM should contact TSgt BC through Capt JP. In addition, Capt JP sent an email to SA LJ at Ramstein AB to the effect that the AFOSI should contact Capt JP in order to speak with JC or TSgt BC.

Around the same time, Capt JP called Capt AS, who was then the trial counsel assigned to Appellant's case at Fort Meade. Capt JP told Capt AS that SA DM's call to interview TSgt BC had made JC very upset. JC had already been upset due to certain other interactions she had with AFOSI.[21] In addition, Capt JP told Capt AS that TSgt BC did not want to be interviewed, and that JC was "thinking about dropping out of the process entirely."

As a result of her conversation with Capt JP, Capt AS spoke with her staff judge advocate, Lieutenant Colonel (Lt Col) JW.[22] Capt AS told Lt Col JW that TSgt BC did not want to be interviewed by AFOSI. Lt Col JW was surprised that AFOSI had not already interviewed TSgt BC by this point in the investigation, and she advised Capt AS to tell AFOSI to continue their investigation regardless of whether they were able to interview TSgt BC.

After consulting with Lt Col JW, on 25 October 2017 Capt AS sent an email to SA LJ at the Ramstein AB AFOSI detachment stating in part:

> We received a call this week from the SVC of [JC] . . . who expressed concern that [JC] may elect to no longer participate in the process due to her level of stress and frustration with the

---

[21] Capt AS later identified two such aggravating factors during her motion testimony. First, the AFOSI had not recorded their initial interview with JC in July 2017, and therefore they had contacted JC after her move to Nellis AFB to obtain another interview or statement. Second, the AFOSI had requested an additional DNA sample from JC because they "did not collect enough of a sample over in Germany."

[22] Lt Col JW was a major (O-4) at the time.

process thus far. One of the issues that upset her recently was that Nellis OSI (pursuant to a lead) had reached out to her husband directly and requested an interview with him. From a prosecution standpoint, we do not believe that an OSI interview with the husband is necessary nor relevant enough to outweigh the risk of the Victim dropping out of the process entirely. . . .

Anything that could be done to minimize the Victim's stress at this stage will be helpful to the case going forward. . . .

On or about the same day, Capt AS sent text messages to Capt JP informing him that she had contacted the AFOSI at Ramstein AB and asked them to tell the Nellis AFB detachment to "go through [Capt JP] for everything." In addition, Capt AS told Capt JP she had sent a "request" to "justify" AFOSI "dropping the lead to interview [JC's] husband." Capt JP thanked Capt AS for "getting that done."

SA LJ replied to Capt AS on 26 October 2017, stating in part:

[T]hem contacting her husband directly is acceptable because her SVC does not provide services for him. The interview of her husband is within our scoping purview for this investigation, now if he declines that is one thing but we have to make an attempt. We have information from a witness interview that she was messaging her husband prior to the incident and we also know from her that she disclosed to her husband what happened, so we are well within our right to ask for an interview.

The same day, Capt AS responded:

I am concerned about the extreme sensitivity of the victim in this case, at this point in the process. . . . I completely understand why the husband is being interviewed, but think it needs to be done with precautions after 4.5 months has gone by. . . .

All I ask is that you consider this input as the investigation wraps up since the actions of OSI now may impact our ability to prosecute the case down the line.

On 27 October 2017, SA LJ replied to Capt AS, in pertinent part, "Sure ma'am, no problem." The Ramstein AB AFOSI detachment cancelled the lead

to the Nellis AFB detachment to interview TSgt BC, and SA DM did not interview him.[23] On 27 November 2017, the charge and specification were preferred against Appellant by his squadron commander. Capt AS administered the oath to the squadron commander at preferral and signed the charge sheet. On 28 November 2017, Lt Col JW receipted for the charge and specification on behalf of the summary court-martial convening authority.

Prior to trial, the Defense submitted a motion to dismiss the charge and specification for actual and apparent unlawful command influence or unlawful influence on the basis that, *inter alia*, Capt JP and Capt AS had "collaborated" to limit the scope of the AFOSI investigation.[24] The Government opposed the motion. Counsel for both parties interviewed TSgt BC prior to a hearing on the motion held on 17 and 18 May 2018.

At the hearing, the military judge received testimony from LC, Capt AS (who by this point had been replaced as trial counsel), Lt Col JW, TSgt BC, SA LJ, SA DM, Capt JP (who had been released as JC's counsel and replaced by another SVC as a result of the unlawful influence motion), and JC. Of note, Capt AS's testimony included the following exchange with trial counsel:

> Q [Trial Counsel]. Did you feel like the victim's husband had any exculpatory evidence? Any evidence that the government was trying to hide from the defense by not interviewing him?
>
> A [Capt AS]. We did. Based on one of the witness's statements. There had to [sic] appeared to be text messages. However, that evidence was already out there and it had already been 4 and a half months. And again, our understanding at the time was that he was going to decline to be interviewed anyway. Plus there was [sic] spousal privilege considerations. So based on all these factors, that was kind of how we ultimately came to our conclusion of what to do.

---

[23] In March 2018, TSgt BC was interviewed by the AFOSI in a related investigation of a complaint made by LC against JC for straddling her on the front patio of the hotel. At that interview TSgt BC provided information about his relationship with his wife JC, her habits with respect to drinking alcohol, and when she called him in the summer of 2017 to tell him Appellant had sexually assaulted her. Agent notes of that interview were provided to Appellant's trial defense counsel.

[24] An additional basis for the motion related to the creation of JC's written statement; Appellant has not raised that aspect of the motion on appeal and it is not relevant to our analysis here.

Q. So in no way were you trying to impede the investigation? Again, and to any evidence that you thought of that was going to be exculpatory in this case?

A. No. And at some point, from a prosecutor's perspective, I mean I--the witness was an outcry witness, right? So I mean there was an assumption that at some point he would be interviewed. It was just at that time, it was really about timing at that point in time, that it was bad timing.

TSgt BC testified *inter alia* that he did not want to speak with the AFOSI in October 2017, that he had "never talked directly" to Capt JP, and that he did not remember any text messages from JC on 10 July 2017. SA LJ testified that after Capt JP's email request, she "let [the other agents] know that they needed to communicate directly with the SVC in order to try and set up something concerning the victim, but that they still needed to still try to get the interview from the victim's husband." SA LJ further testified that she understood the SVC represented only JC and not JC's spouse; however, the AFOSI would not interview a victim's husband against his will. SA DM testified *inter alia* that he did not conduct the interview with TSgt BC because the lead from Ramstein AB was cancelled, and not because of his conversation with Capt JP.

The parties provided supplemental briefs and the military judge heard additional argument on 13 July 2018. On 10 November 2018, the military judge issued a "notice of ruling" that concluded that the Defense had failed to meet its initial burden to show some evidence of unlawful influence. On 3 May 2019, five months after the trial concluded, he supplemented his "notice of ruling" and explained:

> The defense has not shown some evidence that UCI [unlawful command influence] or UI [unlawful influence] occurred. Assuming it has, however, the government has demonstrated beyond a reasonable doubt that the facts as presented do not constitute UCI or UI. Steps to temporarily forestall the interview of [JC]'s husband so as to encourage [JC]'s continued participation . . . do not suggest any representative for the government or the previous SVC [Capt JP] placed any strain upon the public's perception of the military justice system.

The supplemental ruling continued that assuming *arguendo* the Government had failed to disprove unlawful influence, the military judge additionally found "the present status of this case and its current participants" together with all the facts and circumstances of the entire proceedings "prove beyond a reasonable doubt: (1) that there is no intolerable strain upon the public's perception of the military justice system; and (2) that an objective, disinterested and fully-

informed observer would not harbor a significant doubt about the fairness of the proceeding." The military judge went on to note several factors "protecting against any unfairness to [Appellant]," including: the "disengagement" of Capt AS from the prosecution; the exclusion of Capt JP from the courtroom during the testimony of other witnesses on the motion; Capt JP's withdrawal as SVC and compelled testimony on the motion; the availability of TSgt BC prior to pretrial motion practice in May 2018 and July 2018, as well as at trial in December 2018; the parties' extended opportunity to develop evidence and arguments for the motion; and TSgt BC's "near-complete remov[al] from the facts and circumstances directly bearing on the alleged sexual assault."

### 2. Law

"Allegations of unlawful command influence [UCI] are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citations omitted). "Where an assertion of unlawful command influence is litigated at trial, we review the military judge's findings of fact under a clearly-erroneous standard, but we review de novo the legal question whether those facts constitute unlawful command influence." *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000) (citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994)).

"Two types of unlawful command influence can arise in the military justice system: actual unlawful command influence and the appearance of unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual UCI, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. As with actual unlawful command influence, "when an appellant asserts there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id*. at 249 (footnote omitted) (quoting *Stoneman*, 57 M.J. at 41) (additional citation omitted). "Once an appellant presents 'some evidence' of unlawful command influence, the burden then shifts to the government to. . . . prov[e] beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence." *Id*. (quoting *Salyer*, 72 M.J. at 423) (additional citation omitted). If the Government fails to rebut the appellant's factual showing, it may still prevail against a claim of apparent unlawful command influence if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.'" *Id*. at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423).

The United States Court of Appeals for the Armed Forces (CAAF) "has long recognized that Article 37(a)[, UCMJ, 10 U.S.C. § 837(a),] prohibits unlawful influence by all persons subject to the UCMJ." *United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). The test for unlawful influence by an individual acting without the mantle of command authority is essentially the same as the test for unlawful command influence. *Id*. at 76–77.

### 3. Analysis

Appellant contends Capt JP, the former SVC, and Capt AS, the former trial counsel, jointly interfered with the AFOSI investigation and created the appearance of unlawful influence. Appellant emphasizes that Capt AS testified she believed TSgt BC had "exculpatory" evidence regarding JC's text messages, but improperly prioritized JC's participation in the prosecution. He contends the effect of the actions of Capt JP and Capt AS was to allow the alleged victim to "dictate the evidence collection and investigative process," which would cause "[a]ny disinterested member of society [to] harbor significant mistrust and doubt as to the fairness of the proceedings . . . ."

The military judge found the Defense failed to show "some evidence" of unlawful influence; we are not so sure. Unlawful influence "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Boyce*, 76 M.J. at 247; *see Barry*, 78 M.J. at 76–77. Of course, not all influence is *unlawful* influence. It was proper for Capt JP, as SVC, to advocate for the interests of his client, to include her desires

and emotional well-being. Nor was it improper for Capt AS, as trial counsel, to offer the AFOSI agents a view of what those who would prosecute the case needed or wanted from the independent investigation. Arguably, however, their actions show they overstepped the bounds of their authority, or attempted to do so.

Capt JP represented JC, but he did not represent her spouse, and he had no authority to attempt to restrict the AFOSI's access to TSgt BC. Based on the motion testimony and SA LJ's email response to Capt AS, it appears the AFOSI agents involved understood this and the investigation was not substantially affected by Capt JP's direct contacts with the agents. However, Capt JP found a more receptive audience in Capt AS. The AFOSI at Ramstein AB cancelled the lead to interview TSgt BC after Capt AS expressed her concerns to SA LJ. Thus, through Capt AS, Capt JP was indirectly able to cancel the AFOSI's interview with TSgt BC in October 2017. Moreover, although it was not improper *per se* for Capt AS to communicate with the AFOSI detachment at Ramstein AB, the legal office at Ramstein AB would have been the legal advisor to SA LJ and the other agents there on the conduct of their investigations.[25] Similarly, the legal office at Nellis AFB was the legal advisor to SA DM who was tasked with executing the lead from Ramstein AB. We assume for purposes of our analysis that these combined actions of Capt JP and Capt AS may constitute "some evidence" of the appearance of unlawful influence.

The next step in our analysis is to determine whether the Government has demonstrated beyond a reasonable doubt that the predicate facts do not exist or that the facts do not constitute unlawful influence. We find neither. The material facts are not substantially in dispute.

However, the Government may still prevail if it demonstrates beyond a reasonable doubt that the actions did not place an intolerable strain on the public perception of the military justice system, and that an objective, disinterested, and fully informed observer would not harbor significant doubt as to the fairness of Appellant's court-martial as a result of the actions. We agree with the military judge that, in light of all the facts and circumstances, such an observer would not perceive that the actions of Capt JP and Capt AS may have caused

---

[25] The AFOSI report of investigation shows that investigators coordinated legal issues with a judge advocate assigned to the Ramstein AB legal office. Capt AS is mentioned in the report of investigation as providing documents to the AFOSI at Ramstein, but is not identified as the legal advisor to the investigation. In her motion testimony, Capt AS explained "Ramstein is usually the advising legal office, but the case was always ours . . . calls over evidence . . . would always fall under us" because Appellant was assigned at Fort Meade, MD.

Appellant's court-martial to be unfair. Several factors contribute to this conclusion, some of which the military judge referenced in his ruling.

First, there is no indication that the AFOSI's failure to interview TSgt BC in October 2017 actually prejudiced the Defense during Appellant's court-martial. We recognize that evidence of actual prejudice is not necessary in order to find apparent unlawful influence, as opposed to actual unlawful influence. *Boyce*, 76 M.J. at 248. However, the absence of any evidence of prejudice is an appropriate place to begin our assessment of whether an impartial observer would doubt the fairness of Appellant's trial. In particular, in this case TSgt BC was a peripheral witness with no direct knowledge of the charged offense. He received a misleading text message from JC that she was "falling asleep" when she actually drank and socialized for many hours afterwards, but that message was already known and available to the parties without TSgt BC. Moreover, the Defense had ample opportunity to interview TSgt BC before trial and to seek his production as a witness at trial if they believed he had materially helpful information.

Second, as the military judge recognized, by the time of the May 2018 motion hearings, both Capt AS and Capt JP were removed from direct involvement in Appellant's court-martial as trial counsel and SVC, respectively. To the extent their actions cast doubt upon their motives or judgment, their replacement by untainted counsel early in the proceedings tended to remove any appearance of unfairness in the proceedings. Similarly, although not cited by the military judge, we note that Lt Col JW at Fort Meade was not the staff judge advocate to the general court-martial convening authority, the commander of 25th Air Force at Joint Base San Antonio-Lackland, Texas, and therefore Lt Col JW did not directly advise the general court-martial convening authority who referred the charge and specification to trial.

Third, a fully informed observer would note that the unlawful influence motion itself was thoroughly litigated, including briefs, supplemental briefs, extensive documentary evidence and testimony, and multiple arguments. Although the Defense did not prevail on the motion, the alleged impropriety was thoroughly examined, lending confidence to the fairness of the process.

Fourth, although perhaps improperly carried out, as indicated above the apparent motives behind the actions of Capt JP and Capt AS were not illegitimate. The military judge found as fact that "[n]o effort or failure to act by any participant, including [Capt AS] and [Capt JP], was driven by a motive to gain some unfair advantage or harass the accused," and this finding was not clearly erroneous. Appellant compares Capt AS's actions here to the situation in *Salyer*, but we find the comparison entirely unconvincing. In *Salyer*, after the military judge made several rulings unfavorable to the Government, "the Government used its custody of the military judge's official personnel file to search

that personnel file to find personal family information for the purpose of challenging the military judge for bias," and "expressed its displeasure with the military judge's rulings not only on the record but in an ex parte manner to the trial judge's judicial supervisor during the pendency of the court-martial and while the military judge was still presiding." 72 M.J. at 426. As a result, the military judge found that he was disqualified from continuing to preside at the court-martial because a reasonable person might question his impartiality. *Id.* at 422. The CAAF found the net effect was the Government successfully "sought, through inappropriate means, disqualification of the military judge because it did not agree with the military judge's ruling," which created an appearance of unlawful influence. *Id.* at 427. Nothing of the kind occurred in Appellant's case.

Appellant implies the conduct of Capt JP and Capt AS violated his constitutional rights to confront witnesses and to be provided with exculpatory evidence. *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). We disagree. Capt JP and Capt AS did nothing to affect *the Defense's* access to TSgt BC, to seek his production as a witness, or to confront him if he were called at trial. Nor is there any indication the Government improperly withheld information in its possession with regard to TSgt BC. The Government's concern that JC might withdraw her cooperation was legitimate. While we do not endorse the methods used by Capt JP and Capt AS in this case, we are satisfied that there was no impact on Appellant's constitutional rights.

Accordingly, we conclude beyond a reasonable doubt that the alleged unlawful influence did not place an intolerable strain upon the public's perception of the military justice system, and that an objective, disinterested, fully informed observer would not harbor a significant doubt about the fairness of Appellant's court-martial. *Boyce*, 76 M.J. at 249–50.

## B. Due Process

### 1. Additional Background

Appellant argues that his Fifth Amendment[26] due process rights were violated because he was convicted on a theory of sexual assault that was not charged. In his view, he was convicted of sexual assault because the court members found that JC was incapable of consenting due to intoxication instead of the charged bodily harm theory. Appellant argues the Government should have charged the two theories in the alternative but by selecting only a bodily harm theory "it allowed the members to arbitrarily impart their subjective sense of how impaired they believed [JC] was at the time of the alleged offense."

---

[26] U.S. CONST. amend. V.

Appellant cites 19 references in the trial counsel's findings argument and rebuttal argument that JC was "drunk, intoxicated, or blacked out." Appellant argues the Government cannot prove this error was harmless beyond a reasonable doubt because the focus on JC's alcohol use confused the members as shown by the questions they asked about consent and capacity prior to and after findings argument.

The Government answers that the court members convicted Appellant under the charged bodily harm theory. The Government cites the evidence that JC was competent to consent and demonstrated a lack of consent through physical and verbal conduct. The Government asserts the military judge instructed on the correct elements and definitions for a bodily harm sexual assault. The Government agrees with Appellant that during findings argument the trial counsel made a series of references to the evidence of JC's drunken state. However, in the Government's view, these arguments were not framed as supporting a lack of capacity to consent, but were explanations of (1) Appellant's opportunity to take advantage of JC; (2) JC's memory gaps; or (3) why JC responded as she did.

Appellant submitted a reply brief which argues the Government's answer and its citations to the record support his position that he was convicted of sexual assault because JC was incapable of consent.

**2. Law**

The Fifth Amendment's due process clause "does not permit convicting an accused of an offense with which he has not been charged." *United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013) (quoting *United States v. Girouard*, 72 M.J. 5, 10 (C.A.A.F. 2011)). A specification tried by court-martial will not pass constitutional scrutiny unless it both gives the accused notice of the charge he or she must defend against and shields him or her from being placed in double jeopardy. *United States v. Turner*, 79 M.J. 401, 404 (C.A.A.F. 2020) (citations omitted). "The military is a notice-pleading jurisdiction." *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (citation omitted). "A charge and specification will be found sufficient if they 'first, contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend, and second, enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

Article 120, UCMJ, presents various alternative theories of liability for the offense of sexual assault. Article 120(b)(1)(B), UCMJ, as charged here, prohibits the commission of a sexual act by "causing bodily harm." 10 U.S.C. § 920(b)(1)(B). Article 120(b)(2), UCMJ, addresses sexual acts committed by a person who "knows or reasonably should know that the other person is asleep,

unconscious, or otherwise unaware that the sexual act is occurring." 10 U.S.C. § 920(b)(2). Article 120(b)(3)(A), UCMJ, further criminalizes sexual acts committed upon a person who is "incapable of consenting to the sexual act due to impairment by any drug, intoxicant or other similar substance" when that incapacitation is either known by, or reasonably should be known by, the perpetrator. 10 U.S.C. § 920(b)(3)(A).

In order to find Appellant guilty of sexual assault under Article 120(b)(1)(B), UCMJ, by bodily harm as charged here, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon JC by causing penetration, however slight, of her vulva with his penis, (2) he did so by causing bodily harm to her, and (3) he did so without her consent. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(b). "Bodily harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *MCM*, pt. IV, ¶ 45.a.(g)(3). In determining whether a person consented to the conduct at issue, "[a]ll the surrounding circumstances are to be considered," and "lack of consent may be inferred based on the circumstances of the offense." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C). Trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted).

### 3. Analysis

Our court recently addressed and rejected a similar due process challenge where a theory of bodily harm was charged and the victim "had no recollection of whether she did or did not consent," presumably as a result of intoxication. *United States v. Williams*, No. ACM 39746, 2021 CCA LEXIS 109, at *53–54 (A.F. Ct. Crim. App. 12 Mar. 2021) (citations omitted) (unpub. op.). We reach the same result in this case as in *Williams*.[27]

Appellant claims that he was convicted of sexual assault of JC who was incapable of consenting under Article 120(b)(3)(A), UCMJ, an uncharged offense. We agree that Appellant was not charged with an offense under Article 120(b)(3)(A), UCMJ. But we conclude that Appellant was convicted of the charged offense under Article 120(b)(1)(B), UCMJ, and that no due process violation occurred. We address the charging decision, which Appellant claims

---

[27] Similar due process challenges have been rejected by other Courts of Criminal Appeals. *See United States v. Weiser*, 80 M.J. 635, 642 (C.G. Ct. Crim. App. 2020); *United States v. Gomez*, No. 201600331, 2018 CCA LEXIS 167, at *10–11 (N.M. Ct. Crim. App. 4 Apr. 2018) (unpub. op.), *rev. denied*, 78 M.J. 108 (C.A.A.F. 2018). We note that the military judge cited *Gomez* when he ruled on the admissibility of evidence of JC's blood alcohol content which we address in Appellant's next assignment of error.

was defective, and then the trial events including the evidence presented, the instructions of the military judge, and the trial counsel's arguments. We also address Appellant's assertion that questions asked by the court members support his position that he was convicted of sexual assault of JC because she was incapable of consenting.

### a. Charging decision

Appellant was properly put on notice that he was charged with committing sexual assault by bodily harm under Article 120(b)(1)(B), UCMJ. There is no question that the specification expressly alleged every required element. Appellant was fairly informed that he must defend against a sexual assault by bodily harm specification, and he is now able to plead a conviction of this offense if a future prosecution occurred for this offense. *See Fosler*, 70 M.J. at 229.

Appellant claims that the Government was required to charge the bodily harm and incapable of consent offenses in the alternative. We see no merit to this assertion. "It is hardly a novel situation that the available evidence in a particular case might meet the elements of multiple offenses, affording the Government some discretion in its charging decisions." *United States v. Harris*, No. ACM 39640, 2020 CCA LEXIS 299, at *27 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.) (citing *United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014)). In *Harris*, our court rejected an argument that the Government was required to charge these same two offenses in the alternative. *Id.* at *26. We see no reason to decide Appellant's case differently. The Government had the discretion to charge Appellant with both offenses in the alternative, or either offense based on its assessment of the evidence. We find no merit to Appellant's claim that he had a due process right to have both offenses charged in the alternative.

### b. Trial Events

#### i) Evidence of JC's Intoxication

The Government presented evidence that JC consumed alcohol voluntarily prior to the offense. The evidence generally showed JC drank enough alcohol that she was intoxicated before, during, and after the offense. The details of the testimonies of each witness need not be repeated to resolve this assignment of error. Generally, it is sufficient to state that JC's intoxication was a significant part of the evidence presented in Government's case-in-chief.

We do note the Government attempted to quantify how intoxicated JC was at the time of the offense with varying levels of success. For example, Mr. HE testified that JC took a portable breathalyzer test at the hotel that showed a "2.14 alcohol per mil" concentration though Mr. HE could not translate that result to blood alcohol content. Additionally, Dr. GJ, the Government's forensic

toxicologist, testified that he had seen error rates as high as 20 to 25 percent on portable breathalyzer results and opined that these devices are only designed to let the user know whether or not alcohol is present. The Government's next effort to quantify JC's intoxication was JC's blood draw during the SAFE, at 0820 hours or roughly five hours after the assault. Dr. GJ testified that when JC's blood was tested it contained ethanol at a concentration of 0.152 percent.[28] The Government's final effort to quantify JC's intoxication came from a hypothetical question asked of Dr. GJ to determine if he could perform a back extrapolation of alcohol content. Dr. GJ was asked to assume certain particulars such as gender, weight, blood draw time, last meal time, last alcoholic drink time, and other relevant considerations. Dr. GJ said his range would be anywhere from 0.237 to .0.290 percent.

Our court has said before that "the extent to which [the victim] was intoxicated . . . at the time [the appellant] committed the sexual act were part of the 'surrounding circumstances' that were 'to be considered in determining whether [the victim] gave consent.'" *United States v. Campbell*, No. ACM 38875 (reh), 2021 CCA LEXIS 170, at *35 (A.F. Ct. Crim. App. 21 Feb. 2021) (quoting *MCM*, pt. IV, ¶ 45.a.(g)(8)(C)); *see also Harris*, unpub. op. at 26–27 (stating the victim's level of intoxication was part of the surrounding circumstances the court members could evaluate to determine consent and reasonable mistake of fact as to consent). The evidence in this case of JC's intoxication, while a prominent part of the Government's evidence, remained a part of the surrounding circumstances to be considered on whether the Government proved beyond a reasonable doubt that JC did not consent and Appellant did not have an honest and reasonable mistake of fact defense.

Additionally, this case involves evidence of JC's physical resistance before the penetration which supported the charged element that JC did not consent and that Appellant caused her bodily harm. It also involved JC's verbal protests to Appellant during the penetration where JC gave reasons why Appellant should stop what he was doing.

After considering all the evidence presented to members, we have no due process concerns that the evidence alone led to a conviction for an uncharged offense.

---

[28] JC's urine was also collected at some point during the SAFE, though the time it was collected was not specified in the report admitted in evidence. The testing results of the urine showed JC's urine contained ethanol at 0.234 percent. Dr. GJ explained the higher concentration in the urine and the lower concentration in the blood indicated "this individual was eliminating alcohol at the time of the specimen collection."

### *ii) Instructions Prior to Argument*

The military judge's instructions included the correct elements and definitions of sexual assault by bodily harm. The instructions properly included the element, as charged here, that the penetration of JC's vulva by Appellant's penis was "without her consent." The definition regarding consent came from the statutory definition in 10 U.S.C. § 920(g)(8). The instructions on the mistake of fact defense were also correct. In the absence of evidence to the contrary, we presume the court members followed the instructions given to them by the military judge. *See United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015).

Prior to findings argument, the court president asked "under the UCMJ, what is the legal ability for an individual to give consent while under the influence of alcohol." In a session outside of the court members' presence, the court president's question was discussed. The military judge stated his intent to refer the members back to the definition of consent which "means a freely given agreement to the conduct at issue by a competent person" and that they are directed to apply the plain meaning of the term, "competent person." The military judge asked whether either side objected. Neither did.[29] The military judge instructed the members accordingly, and there were no further questions before findings argument. We see nothing improper with the military judge's response to this question.

### *iii) Arguments*

We also considered the references to JC's intoxication in the trial counsel's findings argument and rebuttal argument. We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238. Reviewing the trial counsel's comments in this context, we find them focused on two explanations: (1) why JC demonstrated a lack of consent as she did; and (2) why JC's memory contained significant gaps. The Government was required to prove the element that JC did not consent beyond a reasonable doubt and was permitted to argue reasonable inferences from the evidence of JC's intoxication as part of the surrounding circumstances. We do not interpret the trial counsel's arguments about intoxication, numerous as they were, to have invited the members to convict Appellant of an uncharged offense.

---

[29] The military judge had discussed with the parties earlier whether the instructions from *United States v. Pease*, 75 M.J. 180, 183 (C.A.A.F. 2016) regarding an "incompetent person" and a person "incapable of consent" should be given. At that time, civilian trial defense counsel stated that "[t]he definition of 'a competent person' isn't necessarily what's misleading or confusing" but it would be when read in conjunction with the definition of "incompetent person'" from *Pease*. At this point in the trial, the Defense requested that "at least" no instruction be given on an incompetent person.

The only counsel who argued about incapacity to consent was civilian trial defense counsel who told the members, without objection, "You are not asked to determine whether she is incapable of consenting. There is a completely separate charge for that." After a sustained trial counsel objection on a different point, civilian trial defense counsel returned to the topic of incapacity to consent, without objection, stating "you are to determine whether or not this competent individual did consent or did not consent. That [is] your only question to answer."

### iv) Court Member Questions After Argument

Before deliberations began, the court president inquired whether all three components of the charge and specification must be found for a finding of guilty. The military judge answered that "all three must be proven beyond a reasonable doubt." A different member then asked a follow-up question about voting on "each one of those specifications." The military judge explained that there was only one specification and that there is not a vote on each element of the offense. The military judge also referred to the written instructions that would be provided to the members and explained that if one or two elements are satisfied, but not all three, then that determination is not guilty. The military judge asked both sides if they had an objection to that instruction. Neither side did.

During findings deliberations, one final question was sent out from the same member who had asked the last question before deliberations about voting on the elements. This question was whether the court could define legally what a competent person was and the appropriate response was discussed in a session outside of the members' presence. The Government's position was to give the same instruction that was given when the court president asked a similar question prior to findings argument. The Defense initially proposed an instruction and the military judge agreed to give some of it with modification. The military judge asked whether either side objected to his modification. Neither did. In an open session, the military judge repeated to the court members that they were to apply the plain meaning of the word "competent" and that an "additional instruction should be read in concert with that. It's to aid you in applying the plain meaning of that term." The members agreed that they understood the purpose of the additional instruction. The military judge then repeated the consent definition and instructed

> A "competent person" is a person who possesses the physical and mental ability to consent. Additionally, to be able to freely make an agreement, a person must first possess the cognitive ability to appreciate the nature of the conduct in question, and then possess the mental and physical ability to make and to communicate a decision regarding that conduct to the other person.

### *v) Waiver of Alleged Instructional Error*

The CAAF has held that when an appellant affirmatively declines to object to the military judge's instructions, the issue is waived. *United States v. Davis*, 79 M.J. 329, 332 (C.A.A.F. 2020) (citations omitted), *cert. denied*, 141 S. Ct. 355 (2020). The CAAF will not review waived issues, because affirmative waiver leaves no error to correct on appeal. *Id.* (citation omitted). However, pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c), the Courts of Criminal Appeals have the unique statutory responsibility to affirm only such findings of guilty and so much of the sentence that they find are correct and "should be approved." This includes the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018).

The Defense affirmatively stated that there were no objections to the military judge's instructions in response to the questions of the members. Therefore, we find Appellant has waived any alleged error in the instructions. *See Davis*, 79 M.J. at 331–32. We recognize our authority to pierce waiver to correct a legal error in instructions, but decline to do so because we see no legal error to correct. The military judge carefully navigated the instructional issues in this case, and we see nothing in the instructions that would lead us to conclude that the instructions led to Appellant being convicted of an uncharged offense.

### *c. Conclusion*

We find no due process violation because Appellant was convicted of sexual assault by bodily harm, and the record does not support a conclusion that he was convicted of an uncharged offense. We do note that the Defense moved for a mistrial once Appellant was convicted as charged and raised similar arguments to those presented in this assignment of error. The military judge denied the motion for mistrial, and we have already resolved Appellant's *Grostefon* issues regarding the mistrial motion and ruling adversely to him. In reviewing this assignment of error, we considered the matters argued in the mistrial motion as well as the comments and ruling of the military judge before concluding no due process violation occurred in this case.

Given our resolution of the due process challenge, we do not reach the additional arguments by Appellant that the alleged violation was not harmless beyond a reasonable doubt.

## C. Admission of Evidence of Intoxication

### 1. Additional Background

The Defense initially filed a written motion to exclude evidence of JC's portable breathalyzer results obtained by the German police because it was irrele-

vant and unreliable. By the time the motion was argued, the scope was expanded to also exclude the results of the forensic testing of JC's urine and blood. The Government requested the military judge consider *inter alia* the results of the breath, blood, and urine tests, and related information and reports which confirmed the presence of alcohol as described in the previous assignment of error. The Government presented a chart of the stages of acute alcohol influence/intoxication by Kurt M. Dubowski, Ph.D. and called its forensic toxicologist at the time, Dr. ES, to testify telephonically.

In his telephonic testimony, Dr. ES described the various effects of alcohol consumption on mental abilities, physical abilities, and the impact on memory and recall. Dr. ES explained the results of JC's blood and urine testing, which were analyzed by his laboratory, and explained that he could do a back extrapolation of JC's blood alcohol level at the time of the offense. He concluded it was .24, plus or minus 20–25 percent. Dr. ES testified that back extrapolations are reasonable and scientifically acceptable. Dr. ES testified that breathalyzers have been refined through the years though his preference is to "take a more direct measure of the alcohol in the blood, by that route, versus the breathalyzer."

During argument on the motion, the Government indicated it only intended to admit evidence of JC's breath and blood testing and would not offer the urine testing results. The Government then argued the breath and blood testing results were facts and circumstances of the charged offense and the testing results were the best evidence of JC's intoxication level. The Government argued the results were relevant to JC's state of mind, her diminished ability to respond, and to explain why JC did not remember portions of the evening. The Government described the unfair prejudice to Appellant as minimal, asserting "we are not trying to argue, in the least, that she was incapable of consenting."

The Defense's objection was "to the scientific bolstering" of the evidence that JC drank alcohol. This included the results of the testing and the back extrapolation by Dr. ES. The Defense argued the values themselves were highly prejudicial in a case with members based on the known .08 alcohol content standard for a drunk driving offense. The Defense asserted that this evidence alone would give the members a baseline to conclude JC was incapable of consenting, despite how the case was charged.

The military judge issued a written "notice of ruling" on 10 November 2018, about three weeks before Appellant's trial on the merits. The notice of ruling was on the "evidence of [JC's] measured or calculated level of intoxication." It summarized the Defense's objections as "centered on suppressing any reference to measured and calculated [blood alcohol content] levels, explanations of how those measurements or calculations as well as inferences of clinical symptoms that could be drawn from a particular [blood alcohol content]." The notice

of ruling explained that there were no challenges raised under Mil. R. Evid. 702–705 or *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993), but the issues were the relevance and the Mil. R. Evid. 403 balancing test given the charged theory of bodily harm. In denying the defense motion, the military judge cited generally to our sister service court's opinion in *United States v. Gomez*, No. 201600331, 2018 CCA LEXIS 167 (N.M. Ct. Crim. App. 4 Apr. 2018) (unpub. op.), that evidence of intoxication is relevant to "determining whether that person consented to the sexual conduct at issue." The notice of ruling did not contain a Mil. R. Evid. 403 balancing test for this evidence. The notice of ruling did not mention that the Government conceded it would not offer evidence of JC's urine testing.

Trial on the merits began on 3 December 2017. A new senior trial counsel and trial counsel had been detailed to the case, though an uncertified assistant trial counsel remained on the case. After the court members were seated, the assistant trial counsel offered a series of prosecution exhibits into evidence including Prosecution Exhibit 14, the results of JC's blood and urine testing for alcohol. Civilian defense counsel responded, "Subject to the previous objection on what we believe to be relevance, no objection to this, Your Honor." The military judge responded that the Defense had "preserved that issue" and there being no additional objection, admitted Prosecution Exhibit 14. During the Government's case-in-chief, Dr. GJ testified about JC's blood and urine results. Mr. HE, the German police investigator, testified to JC's portable breathalyzer testing results.

Prior to authenticating the record on 3 May 2019, the military judge issued a written ruling which was marked as an appellate exhibit and directed to be placed in the record of trial. The written ruling's essential findings of fact included (1) that Dr. ES was qualified as an expert "both during pretrial motion practice and at trial;" and (2) "his testimony was helpful in that it assisted the Court and then the trier of fact in understanding evidence related to [JC]'s intoxication." The military judge was correct that Dr. ES testified during pretrial motion practice. However, Dr. ES did not testify during the trial on the merits; instead, Dr. GJ testified as the Government's expert forensic toxicologist. We find the military judge's findings of fact about Dr. ES being qualified as an expert at trial, testifying at trial, and assisting the trier of fact are clearly erroneous.

On the issue of relevance, the military judge's written ruling is consistent with the "notice of ruling." Additionally, the written ruling stated that the military judge "confirmed his conclusion" that the objected-to information was not substantially outweighed by the dangers listed in Mil. R. Evid. 403's balancing test and provided analysis of the probative value, and likelihood of unfair prejudice, confusion of the issues, or misleading the members.

Before us, Appellant asserts the military judge held an erroneous view of the law regarding the relevance of evidence of intoxication and the admission of the evidence was not harmless. The Government responds that the military judge did not abuse his discretion in admitting the intoxication evidence as part of the "all the surrounding circumstances" of the offense. On appeal, the parties do not address whether the military judge's "notice of ruling" covered the urine testing results as the Government conceded during motion practice that it was not offering those results and would redact them from their proposed exhibit, or whether this issue was waived when the urine testing results and later testimony were admitted. We address that matter in our analysis below.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). A military judge abuses his or her discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. White*, 80 M.J. 322, 327 (C.A.A.F. 2020) (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)). However, we "give[ ] military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the Rule 403 balancing." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation omitted).

**3. Analysis**

As noted above, the military judge's written ruling contained a few clearly erroneous findings of fact regarding Dr. ES testifying before the trier of fact when Dr. GJ did. But this abuse of discretion does not affect the military judge's "notice of ruling" which found the evidence of intoxication relevant and admissible as it was issued before trial on the merits commenced. Therefore, we can still review the notice of ruling for an abuse of discretion.

The military judge's notice of ruling concluded the intoxication was relevant after considering our sister service court's decision in *Gomez* and the statutory definition of consent in Article 120(g)(8)(C), UCMJ, 10 U.S.C. § 920(g)(8)(C). We agree that JC's intoxication was relevant as part of "all the surrounding circumstances" to be considered on the issue of consent consistent with Article 120(g)(8)(C), UCMJ. We find no abuse of discretion on the military judge's notice of ruling on the question of relevance.

The notice of ruling does not show that the military judge conducted a Mil. R. Evid. 403 balancing test. Therefore, we will afford the military judge no discretion on this part of his ruling.[30] However, even affording the military judge no deference because he failed to state that he conducted a balancing test in his "notice of ruling" or articulate his reasons, we conclude the probative value of the evidence of JC's intoxication was not substantially outweighed by the countervailing interests in Mil. R. Evid. 403. The evidence was important to the assessment of JC's memory and to the issues of consent and whether an honest mistake of fact, if held by Appellant, would be reasonable under the circumstances. The manner in which the evidence was presented, including the use of expert testimony of Dr. GJ, significantly reduced the danger of unfair prejudice, confusion of the issues, or misleading the members. The military judge's instructions before findings argument and in response to court member questions also reduced these same dangers.

Lastly, we must briefly address the Government's change in position from motion practice to trial about admitting evidence of JC's urine results. The record gives us little insight into when or why the Government reversed course and decided to offer the urine results. We can discern that the Defense was not caught off-guard when the Government offered Prosecution Exhibit 14 or when Dr. GJ testified to the urine results. The Defense stood on its relevance objection with the exhibit and offered no objection to Dr. GJ's testimony. Therefore, we find that if there was an error from the Government's change in position, it was waived.[31]

---

[30] R.C.M. 905(f) permitted the military judge to *sua sponte* reconsider any ruling, other than one amounting to a finding of not guilty, prior to authentication. But, we cannot untangle the military judge's clearly erroneous findings of fact in his written ruling from the Mil. R. Evid. 403 balancing test he conducted in that written ruling. In our view, the best approach for trial judges is to articulate the Mil. R. Evid. 403 balancing test analysis at the time of the ruling.

[31] We express our concerns that the Government failed to (1) document its reversal of position on the record; (2) state when it occurred; (3) state that the Defense was notified; and (4) offer its view on whether the change in position impacted any motion that had been submitted to the military judge or had already been ruled upon by the military judge.

**D. Legal and Factual Sufficiency**

**1. Additional Background**

Appellant argues on appeal as he did at trial that JC's lack of credibility and "the inconsistencies between her statements and the other evidence introduced by the Government leaves any rational fact finder with many unanswered questions, and thus reasonable doubt."

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *Dykes*, 38 M.J. at 272 (citations omitted). As such, we cannot consider testimony from pretrial motions practice. *See United States v. Beatty*, 64 M.J. 456, 458–59 (C.A.A.F. 2007).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to convict Appellant of the charged sexual assault in violation of Article 120, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) that at or near Wiesbaden, Germany, on or about 11 July 2017, Ap-

pellant committed a sexual act upon JC by penetrating her vulva with his penis; and (2) that Appellant did so by causing bodily harm, to wit: penetrating JC's vulva with his penis without her consent. *See MCM,* pt. IV, ¶ 45.b.(4)(b).

"Sexual act" includes "contact between the penis and vulva . . . and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight." *MCM*, pt. IV, ¶ 45.a.(g)(1).

"Bodily harm" means "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *See MCM*, pt. IV, ¶ 45.a.(g)(3). "Consent" means a freely given agreement to the conduct at issue by a competent person. *See MCM*, pt. IV, ¶ 45.a.(g)(8)(A). An expression of lack of consent through words or conduct means there is no consent. *Id*. "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist because of another's person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C). "The burden is on the actor to obtain consent rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019).

The defense of mistake of fact as to consent would apply if Appellant, because of ignorance or mistake, incorrectly believed that JC consented to the sexual act. *See* R.C.M. 916(j)(1). In order to rely on a mistake of fact as to a consent defense, Appellant's belief must have been reasonable under all the circumstances. *See id*.; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

### 3. Analysis

As to the first element of the offense, the members could have determined there is abundant evidence that, at the time and place alleged, Appellant penetrated JC's vulva with his penis based on JC's testimony at trial and the corroborating DNA evidence. As such the only remaining issues are whether JC did not consent, and if so, whether Appellant had a reasonable mistake of fact as to JC's consent.

Beginning with consent, the members could have reasonably determined that JC's account of the assault indicated she manifested a lack of consent. She described being forcibly pushed into the room and onto the bed; physically resisting while having her clothes removed by rolling from side to side; resisting Appellant's kisses by turning her head from side to side; and as or shortly after Appellant penetrated her, crying out regarding her marriage, Appellant's mar-

riage, and her possible pregnancy. The members could have reasonably determined that JC's testimony about actual resistance demonstrated that she did not consent.

Although Appellant does not argue on appeal that he had a reasonable mistake of fact as to JC's consent,[32] the Government was still required to prove beyond a reasonable doubt that Appellant was not so mistaken. Here, the members could have reasonably determined that even if Appellant held such a mistake of fact, it was not objectively reasonable under all the circumstances.

Appellant raises ten reasons why the evidence is legally and factually insufficient. The first is that there are too many conflicts with JC's testimony both internally and externally with other evidence which leave any rational factfinder with unanswered questions. Appellant questions why JC only remembers "facts that benefit the government's case?" As examples, Appellant notes that JC did not recall engaging with other males on the patio; straddling LC's lap; crying in the bathroom over her previous miscarriage; mentioning in the bathroom that she may be pregnant again; departing the elevator with Appellant; going to LC's room; or after the assault telling LC that she was not drunk or that her husband was going to think she was a "whore." Appellant argues that these events happened either "immediately before or after the incident; and yet, JC conveniently does not remember any of these actions occurring." However, the members could have determined that the gaps in memory were not "convenient" as Appellant claims, but explained by the testimony of Dr. GJ who explained how alcohol consumption can lead to "impairment in memory" and "a continuum of effects" that are based on an individual's previous exposure to alcohol and many physical factors. Further, the members may have determined these gaps in memory did not contradict JC's testimony concerning the essential elements of the offense.

Appellant's second reason involves the beer bottle in JC's bathroom and why her toilet seat was "lifted." Appellant argues that he would have been unable to use both his arms to push JC into her room with a beer bottle in his hand and questions why her testimony does not include any reference to Appellant using the bathroom. The members could have again concluded that these facts do not contradict her testimony concerning the essential elements

---

[32] The military judge and parties agreed the evidence raised the issue of reasonable mistake of fact as to consent. In particular, the military judge cited two prosecution exhibits that contained a statement by JC to Dr. K that JC had confronted Appellant immediately after the assault, and Appellant responded to the effect that he did not do anything she did not want to do. JC was not asked about this statement during her trial testimony.

of the offense. The Government did not need to prove how the beer bottle came to be in the bathroom or when the toilet seat was raised.

Appellant's third reason is that JC changed facts in her testimony from prior statements as "deliberate lies spun for the purpose of ensuring a timeline provided by other witnesses" which better coincided with her statement. Examples provided by Appellant include her changing the date of her last menstruation; her statement to Dr. K that Appellant "followed her into the room;" and her statement to SA LJ that she was "already in her room and asleep." Regarding JC's menstruation, the members could have determined that the date of her previous menstruation was an error that JC made when she talked to Dr. K and later repeated to Dr. N or that JC's trial testimony was the error. Regardless of when the error occurred, JC's last menstruation was not an essential element of the offense. JC's statement to Dr. K about Appellant following her would explain how Appellant may have had the opportunity to enter her room and use the restroom. The members could have reasonably believed this occurred before the first visit to LC's room rather than immediately prior to the assault. Without question, JC's statement to SA LJ about being "already asleep" when she heard a knock on her door contradicted JC's trial testimony and her earlier statement to Dr. K. The members could have reasonably determined this contradiction, while present, did not raise reasonable doubt about the essential elements of the offense and was not the product of a deliberate lie by JC.

Appellant's fourth argument is that JC's testimony changed the "nature of the assault" from "pure resistance" to "continuously blacking out" which makes her testimony less credible. This argument is more about the testimony of Dr. K and Dr. N that JC did not tell them that she lost consciousness. It does not appear that Dr. K or Dr. N asked JC whether there were things she did not remember, and it is very reasonable for the term "a loss of consciousness" to mean different things to different people, particularly to someone who is either still drunk or sleep deprived. Additionally, until JC was questioned about simple things, like did she remember how she went upstairs to her room, she may not have appreciated how significant the gaps were in her memory. There is little question that by trial JC's memory gaps were well known. A reasonable factfinder would consider JC's use of terms like "passed out" or "blacked out" in her testimony to describe the times where she could not recall what occurred but she knew that some time must have passed.

Appellant's fifth argument is that JC and Appellant both should have sustained injuries during the assault. However, the members could have relied on Appellant's own expert Ms. MO to explain the lack of injuries on both JC and Appellant. As for JC's lack of reported injuries, Ms. MO testified that non-con-

sensual sex can occur without physical trauma; and there is no diagnostic injury for sexual assault. As for Appellant, JC never testified that she hit or scratched Appellant, and the members could have concluded that based on JC's description of the assault and her intoxication level that no injuries would have been found. Moreover, Ms. MO testified that everyone has a different baseline for bruising and she could not say how long a particular bruise, if present, would last. Reasonable court members could have also determined that if Dr. K's clinic used blue dye when JC reported pain in her vaginal area, like CPT MM would have used, it may have shown injuries on JC's external genitalia that Dr. K could not see with the naked eye.

Appellant's sixth argument is that if JC cried out as she stated during her testimony then someone in the hotel should have heard her. However, Appellant seemingly ignores the testimony of SrA CB who stated that she did not remember hearing any noise outside her room or noise that she thought came from some other place in the hotel. Nor did any other witness staying in the hotel testify that the walls were so thin that JC's cries about her marriage and husband, Appellant's marriage, and possibly being pregnant were likely to be heard.

Appellant's seventh argument is JC's testimony showed that her clothes should have been torn or ripped and questions why they were "neatly folded." Appellant's characterization of the clothes being neatly folded is not supported by the record and Mr. HE denied as much during his testimony. JC's black sweatpants were found "folded inwards, nested" somewhat covered by the bed's "cover" which looks like a comforter. JC's bra and tank top were under the luggage rack, an odd location, and the bra was twisted around the tank top. The evidence did not show any tears or rips in JC's clothing, but JC also never claimed that she heard clothing ripping or tearing when Appellant removed her clothes.

Appellant's eighth argument is that if he had just sexually assaulted JC he would not have assisted her. However, the Government was not required to prove why Appellant assisted JC after he assaulted her by finding SrA CB. Further, the members could have reasonably concluded that Appellant's response was consistent with his apology to JC that he was sorry, and that he hoped SrA CB would calm JC down when he could not.

Appellant's ninth argument is that JC fabricated the allegation against him to hide another possible miscarriage caused by her drinking that evening and consensual intercourse with Appellant. However, the members could have discounted this theory for two reasons: (1) based on their observations of JC's testimony during trial and their assessment of her credibility; and (2) based on the testimony of LC concerning her observations of JC the second time Appellant and JC went to LC's room. On the second reason, LC testified that JC

appeared "almost like she was kind of out of it, like, almost like sleep walking, just—they both looked drunk, but it was like less of a happy drunk and more of a tired drunk." Members could have concluded that LC's testimony supported JC because it was unlikely JC consented to sexual intercourse shortly after appearing so tired that she was almost sleep walking. We also note that the members could have determined that if JC's intent was to hide a miscarriage, her alcohol consumption, and her infidelity from her husband, the last thing she would want to do is ask Appellant to get SrA CB and then have SrA CB notify the German police both of which would increase the risk that her husband would find out.

Finally, Appellant's tenth claim is that there is a reasonable explanation other than guilt. Appellant posits a theory that JC wanted to "let loose and have fun." At 0252 JC used her key to access her room and something about that process made her and Appellant decide they needed her facility access badge. As such, they went to LC's room. "Exactly nine minutes later, they were back at JC's room" but attempted to open the room with Appellant's key. Appellant then argues that "[t]heir inability to access the room with his room key likely prompted them to think they had to go back to [LC's] room to retrieve another key or badge. They went back to [LC]'s room and exactly nine minutes later, were back at JC's room." At that point Appellant entered JC's room with her while still carrying his beer bottle and used JC's restroom leaving the toilet seat up and the beer bottle on the bathroom counter. Once he exited the bathroom he observed JC as she was changing clothes and which was "arousing," they began kissing, and "once their clothes were removed, he performed oral sex on her, followed by vaginal intercourse."

However, the members could easily discount this theory based on the evidence before them and conclude that the inferences Appellant wanted drawn from the evidence were unreasonable. Most prominently, the members would have to discount JC's testimony and speculate, without evidence, that Appellant witnessed JC changing her clothes, that this aroused him, and that their kissing was mutual. There was no direct evidence on these points, nor were there reasonable inferences to be made from the other evidence. In a review of legal and factual sufficiency we are limited to the evidence produced at trial. *Dykes*, 38 M.J. at 272. Additionally, LC also did not provide testimony that Appellant was carrying a beer bottle during either visit and did not testify about whether JC had changed into sweatpants or was still wearing her jeans during both visits. Further, the members could have relied on LC's testimony concerning JC's demeanor the second time JC and Appellant came to her room as well as JC's lack of interest in Appellant throughout the entire night in evaluating the evidence. When coupled with Appellant's prior interest in JC, a rational factfinder could have found beyond a reasonable doubt that Appellant

penetrated JC's vulva with his penis without her consent and her physical and verbal resistance demonstrated that this was a nonconsensual sexual act.

Drawing "every reasonable inference from the evidence of record in favor of the [P]rosecution," the evidence was legally sufficient to support Appellant's conviction beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction is both legally and factually sufficient.

### E. Mil. R. Evid. 412

#### 1. Additional Background

Trial defense counsel filed two motions to admit evidence under Mil. R. Evid. 412. Only the second ruling by the military judge is at issue in this appeal. Prior to ruling, the military judge conducted a closed session where JC testified telephonically. Appellant testified in person for the limited purpose of the motion. In general, the Defense sought to admit evidence that immediately prior to the penetration alleged in the charged offense JC had engaged in consensual sexual behaviors with Appellant. The Defense argued the proffered evidence was relevant to the charged offense and the mistake of fact defense and admissible under Mil. R. Evid. 412(b)(1)(B) and (C).

In support of the Defense's argument, Appellant testified that JC (1) straddled him; (2) kissed him during the straddling; (3) assisted him when he removed her pants; (4) moaned when he performed oral sex on her; and (5) assisted him when he took off his shorts. Appellant also testified that he kissed JC "up her torso" but not how JC responded. The military judge ruled that Appellant could testify to all of these matters in the Defense's case-in-chief.

Trial defense counsel also wanted to cross-examine JC about these matters in the Government's case-in-chief. Accordingly, in the closed hearing, JC was called as a witness by the Defense and questioned by the parties and the military judge about her memory of what occurred prior to penetration. Civilian trial defense counsel started the questioning in this area by asking JC whether she recalled straddling Appellant prior to vaginal intercourse. JC responded "I did not willingly consent to any physical relations with Staff Sergeant Horne." When asked if she leaned in and kissed Appellant, JC responded "Ma'am I did not willingly consent to any physical relations with Staff Sergeant Horne." At this point, the military judge interceded and instructed JC that her responses could be interpreted three different ways: (1) she did not remember; (2) it did not happen; or (3) she was being non-responsive. The military judge stated he

would not guess what JC meant and that she was required to answer the direct questions that were posed.

Thereafter, JC testified that she did not recall: (1) straddling Appellant; (2) ever kissing Appellant back; (3) taking off her own pants; or (4) assisting Appellant in taking off his shorts and underwear. JC recalled Appellant kissing her body, but she did not recall moaning in pleasure while he did so. JC also recalled Appellant performing oral sex on her. JC was then asked by civilian trial defense counsel, "Do you recall moaning and what sounded like pleasure while he performed the oral sex on you?" JC responded "No. Absolutely not."

The trial counsel sought to clarify JC's responses by asking "When you're saying you don't recall, you mean, those things didn't happen in your memory of the interactions." After requesting some additional clarification, JC testified as to the straddling, "In my eyes, that did not happen." JC stated "absolutely not" on whether she helped Appellant remove his "pants." JC was then asked "you didn't moan in pleasure during any of this, the sexual assault?" JC responded. "No sir. No. That's disgusting." Finally, JC admitted there were gaps in her memory but there was never any part of the sexual interaction with Appellant that was consensual.

The military judge issued a written "notice of ruling" prior to trial which was supplemented with another written ruling on 3 May 2019[33] prior to authentication. The supplemental ruling stated that the notice of ruling was "adopted in its entirety."

The notice of ruling permitted cross-examination of JC in two areas: (1) that Appellant performed oral sex on her and (2) that he kissed her body. JC's direct examination at trial covered both of these topics.

In the notice of ruling, the military judge limited cross-examination of JC in the other areas using the below rationale:

> [U]nless and until the defense can produce admissible evidence during the court-martial . . . beyond flat denials by [JC] on cross-examination during the government case in chief, it has failed to meet either identified exception to [Mil. R. Evid.] 412. The Court specifically notes that the consistent testimony and accounts of [JC] on this topic strongly suggest that she has no recollection of the specific acts in this category, which further undermines the expected utility of reference thereto in determining her credibility in the absence of contradictory evidence.

---

[33] In one place, this supplemental ruling is incorrectly dated 3 May 2018.

> Without some connection to the accused's actions, decisions or state of mind, this information is not clearly relevant, material or favorable to the defense. The Court has considered the defense's arguments that even without accompanying evidence it has met the exception of [Mil. R. Evid.] 412(b)(1)(C) (*e.g.*, attacking her general credibility and exploring lapses in memory). They are unavailing as the information sought, barring a complete reversal from the witness, would merely be the manner in which an event is rejected as having not occurred within the greater context of confrontation over the charged offense and several surrounding matters still a part of [JC]'s recollection.

> Even if this information was minimally relevant, without evidence connecting it to the accused's actions, decisions or state of mind, it is not directly and substantially linked to any material fact in issue, understanding the defense will still have several and distinct lines of impeachment that remain available. Moreover, that minimal relevance is substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the court members. A reasonable panel would not receive a different impression of [JC]'s credibility if the defense were permitted to reference acts she has consistently reported no memory of within the government case in chief. Unless and until, of course, some connection is drawn with admissible evidence during the court-martial to the events actually occurring and the accused's knowledge preceding the alleged sexual assault.

The military judge noted that the Defense had the opportunity to request reconsideration in a hearing without the court members. While not in his notice of ruling, during argument on the motion the military judge explored with the Defense how to handle the possibility that JC's memory would change between the time of her telephonic testimony on the motion and the time she testified at trial. The military judge noted that JC could be called in a session outside the members' presence to confirm that her memory had not changed. The Defense did not ask for such a hearing before JC's cross-examination and did not move for reconsideration of the military judge's ruling.

In his 3 May 2019 supplemental Mil. R. Evid. 412 ruling the military judge made several essential findings of fact including:

> The defense called [JC] as a witness in support of an earlier motion but developed responses relevant to this filing in that exchange. Having personally observed [JC]'s telephonic and then live testimony on multiple occasions, the Court found her alert

and capable of following questioning from the defense, the government and the military judge. Across the various forms of evidence and the testimony presented, she has consistently reported no memory of the acts the defense sought to reference through cross-examination during the government's case and, potentially, examination of the accused during any defense case.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *Erikson*, 76 M.J. at 234 (citation omitted). The law regarding the abuse of discretion standard is cited above in our resolution of Appellant's third assignment of error. *White*, 80 M.J. at 327; *Lloyd*, 69 M.J. at 99.

The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted). Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted).

The second exception under Mil. R. Evid. 412 includes "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent . . . ." Mil. R. Evid. 412(b)(1)(B). Evidence otherwise admissible under Mil. R. Evid. 412(b)(1)(B) may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)).

The third exception under Mil. R. Evid. 412 provides that the evidence is admissible if its exclusion "would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). Generally, evidence of other sexual behavior by an alleged victim is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock*, 70 M.J. at 318 (citation omitted). Relevant evidence is evidence that

has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Materiality "is a multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue." *Ellerbrock*, 70 M.J. at 318 (alteration in original) (internal quotation marks and citations omitted). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "If after application of the [Mil. R. Evid.] 403 factors the military judge determines that the probative value of the proffered evidence outweighs the danger of unfair prejudice, it is admissible no matter how embarrassing it might be to the alleged victim." *United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011).

Credibility assessments are not an appropriate element of a military judge's Mil. R. Evid 412(b)(1)(C) analysis. *United States v. Leonhardt*, 76 M.J. 821, 827 (A.F. Ct. Crim. App. 2017). The Defense is not required to convince the military judge that the proffered evidence is true, rather the military judge must decide whether the proffered evidence is relevant and otherwise admissible. *Id.*

"[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, . . . or interrogation that is repetitive or only marginally relevant." *Gaddis*, 70 M.J. at 256 (first omission in original) (quoting *Van Arsdall*, 475 U.S. at 679) (additional citations omitted). In determining whether the exclusion of evidence deprived Appellant of a fair trial or an opportunity for cross-examination, we ask whether "[a] reasonable jury might have received a significantly different impression of [the witness]'s credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680.

Mil. R. Evid. 103(e) states, "In a court-martial composed of a military judge and members, to the extent practicable, the military judge must conduct a trial so that inadmissible evidence is not suggested to the members by any means."

Mil. R. Evid. 611(a) instructs, "The military judge should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

### 3. Analysis

Appellant's counsel argues that the military judge had an erroneous view of the law because "[o]nce impeachment evidence is deemed to be relevant, the military judge should permit the accused to cross-examine the respective witness. Requiring [Appellant] to first put forth the evidence in his case-in-chief runs counter to controlling law and precludes [Appellant] from conducting an effective cross-examination." Appellant's counsel acknowledges that Mil. R. Evid. 611(a) allows a military judge to control the mode and order of interrogating witnesses but argues that the military judge preemptively shut the door completely "on otherwise relevant cross-examination." Appellant's counsel argues the preclusion of the cross-examination was not harmless beyond a reasonable doubt because JC only recalled facts that were helpful to her or the Government winning the case and that she "did not recall" unfavorable facts.

Appellant personally identifies additional arguments that were raised by his military defense counsel in his clemency request. Some of these arguments included that (1) the military judge gave preferential treatment to JC over Appellant in his ruling; and (2) Appellant could not fully explore the incredulity of JC's memory gaps without giving up his constitutional right to remain silent.

The Government answers that the military judge did not abuse his discretion because the evidence had low probative value and could not be used as substantive evidence because JC could not testify that the events occurred. The Government notes on the latter point that civilian trial defense counsel conceded as much during argument on the motion. Regarding impeachment of JC, the Government argues that without Appellant's testimony, there was no contradictory evidence to suggest JC was being untruthful about the inability to recall certain events. Further, the Government argues the evidence had low materiality because Appellant had plenty at his disposal to impeach JC's credibility, memory, and motives to fabricate and the members would not have received a significantly different impression of JC had the questioning been allowed.

We need not reach each nuance of each of the parties' arguments. Rather, we focus on one overarching issue: whether the military judge correctly applied the law when he determined "unless and until the defense can produce admissible evidence during the court-martial . . . beyond the flat denials by [JC] on cross-examination during the government case in chief, it has failed to meet either identified exception to [Mil. R. Evid.] 412." As best as we can determine, the military judge concluded that the applicability of the Mil. R. Evid.

412(b)(1)(C) exception was conditioned on whether the Defense produced admissible evidence *during* the court-martial.[34] In our view, the Defense had already demonstrated that it had admissible evidence, in the form of Appellant's testimony, and we see nothing in the case law applying the exception in Mil. R. Evid. 412(b)(1)(C) that required the Defense to admit the evidence, such as through trial testimony by Appellant or through other admissible evidence. Therefore, we will assume without deciding that the military judge was influenced by an erroneous view of the law. Rather than conduct our own assessment of relevance, materiality, and whether the probative value of the evidence outweighs the dangers of unfair prejudice, we will test for whether the assumed error was harmless beyond a reasonable doubt.

There are five non-exclusive factors to assess whether the assumed error was harmless beyond a reasonable doubt:

> [(1)] [T]he importance of the witness' testimony in the prosecution's case, [(2)] whether the testimony was cumulative, [(3)] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [(4)] the extent of cross-examination otherwise permitted, and, of course, [(5)] the overall strength of the prosecution's case.

*Ellerbrock*, 70 M.J. at 320 (second alteration in original) (quoting *Van Arsdall*, 475 U.S. at 684). We address the above five factors and four additional matters before concluding that the assumed error in limiting JC's cross-examination was harmless beyond a reasonable doubt.

Assessing the first factor, JC's testimony was crucial to the Government's case so this factor weighs heavily in Appellant's favor.

The second factor of cumulativeness weighs in Appellant's favor but only marginally. The questioning on the removal of JC's clothes would have been cumulative. During cross-examination, JC gave answers, albeit nonresponsive ones, and explained how her clothing was removed. JC testified that Appellant "did take off [her] clothes" and she "didn't help him remove [her] clothes." This is essentially the same cross-examination that was excluded. However, other portions, like the straddling, were not explicitly addressed in the other evidence which leads us to conclude that the second factor weighs marginally in Appellant's favor.

Assessing the third factor, we see evidence that corroborated JC and evidence that contradicted her as described in our legal and factual sufficiency analysis. We see the material points of JC's testimony about her memory as

---

[34] We do not assess whether the military judge's ruling was an abuse of discretion under the second exception. Mil. R. Evid. 412(b)(1)(B).

threefold: (1) what JC did with Appellant after leaving the hotel's front patio, but before entering her room, such as visiting LC's room twice; (2) what occurred inside her room when Appellant was present; and (3) what JC told others occurred inside her room. On the first point, JC had no memory of visiting LC's room while LC recalled these visits and testified how JC appeared during them. On the second point, JC's testimony regarding her demonstrated lack of consent was not contradicted by Appellant because he did not testify on the merits. However, JC's memory was impeached on more minor considerations, such as how a beer bottle ended up in her bathroom. Third, JC's statements to others about what occurred in her room contradicted her testimony in certain places. For example, Dr. N believed that JC said "Yes" when asked during the SAFE whether JC remembered "the whole event" yet JC testified to memory gaps after Appellant started trying to kiss her. Additionally, Ms. MO testified as a defense expert that she would have expected the sexual assault forensic exam to document marks on JC's arms, wrists, and abrasions, redness and potential injuries in JC's genital area based on JC's descriptions of the assault. On the whole, this third factor weighs moderately in Appellant's favor even without Appellant's testimony because of the contradictions with JC's memory and her statements to others.

The fourth factor—the extent of the cross-examination—weighs heavily in favor of the Government. Civilian trial defense counsel asked three sets of cross-examinations questions of JC, totaling about 50 pages in the record of trial. JC's memory gaps before, during, and after the event were a prominent feature of the cross-examination.

Assessing the fifth factor, we see strengths and weaknesses in the Government's case. As far as strengths, JC's report of being raped was immediately made to SrA CB and there was evidence that Appellant had prior sexual interest in JC but that JC displayed no sexual interest in Appellant. Further, the evidence of JC's intoxication offered a reasonable explanation for the gaps in her memory both before, during, and after the event. JC's immediate emotional reaction, before Appellant even left the room, was powerful evidence. The Defense recognized the importance of JC's reaction and attempted to deflect it with evidence that JC thought she was miscarrying. This was a reasonable approach by the Defense and showed weaknesses in the Government's case. This is particularly so as witnesses testified that JC told them she was or might be pregnant or was at least trying, and JC disagreed that she made these statements or did not recall making them. Even so, JC testified that she told Appellant she might be pregnant during the assault. The evidence found on the bedsheets was described at different times as "blood," "spotting," and "a mixture of blood and semen." This provided some support for the Defense's theory that JC believed she was miscarrying. However, other evidence showed demonstra-

bly that JC attributed the evidence on the bedsheets to nonconsensual penetration with no mention of a belief regarding miscarrying. There was also conflict regarding whether JC knew she was pregnant, suspected she was pregnant, or only learned she was pregnant once she received the results of her pregnancy test. While we found the evidence supporting the conviction both legally and factually sufficient, it is an acknowledged close call and we do not characterize the Government's case as "strong" and our dissenting colleague was not personally convinced of Appellant's guilt. We weigh this factor in Appellant's favor.

The five factors in *Ellerbrock* are not exclusive. In this case, we also weigh four additional matters: (1) whether JC's cross-examination provides insight into how she would have answered questions if allowed; (2) whether JC's direct examination provides insight into how she would have answered the questions if allowed; (3) whether JC's memory gaps immediately prior to the assault were thoroughly covered during cross-examination; and (4) whether the demeanor JC displayed during motion practice questioning on the excluded matters was shown during her cross-examination at trial. We find each of these four matters weighs in favor of the Government.

First, JC's cross-examination during trial provides insight into how JC would have answered questions about assisting in the removal of Appellant's clothing, whether she kissed Appellant back at any point, and whether she straddled Appellant. Regarding removal of Appellant's clothing, JC's cross-examination included that she did not see Appellant take off his clothing and that she "blacked out" between when he was removing her clothes and when penetration occurred. Given this portion of JC's testimony, we see no reasonable possibility that JC would have testified that she recalled helping Appellant remove his clothes. Regarding kissing Appellant back, JC's cross-examination included that Appellant tried to kiss her while he was removing her clothes and he made contact once with her mouth. She denied opening her mouth and described that Appellant was forcing his mouth onto hers. We see no reasonable possibility that JC would have testified that she recalled kissing Appellant back when he kissed her. Consistent with the military judge's ruling, JC did not testify whether she straddled Appellant or not. However, the cross-examination never demonstrated a point in time where JC recalled being in a physical position where she could have straddled Appellant. This leads us to conclude that JC would have denied that she straddled Appellant or denied recalling it.

Second, the direct examination of JC in front of the court members also provides insight into how JC would have answered the questions regarding whether she recalled moaning when Appellant performed oral sex on her. JC testified during direct examination that she was trying to figure out what was

happening during the oral sex. We see no reasonable possibility that JC would have recalled pleasurable moaning around the same time when she was trying to figure out what was happening.

Third, JC's memory gaps immediately prior to the offense were thoroughly covered during cross-examination. JC indicated at various points that she "blacked out" and "passed out" which showed obvious gaps in her memory. This permitted the defense's closing argument to include that JC had "convenient memory loss" and "convenient selection of her memory" even without the cross-examination at issue.

Fourth, JC's demeanor during cross-examination at trial was very similar to the manner in which she testified during motion practice, at least after the military judge interceded and directed JC to answer the questions she was asked. Both times JC testified—during the motion and during the Government's case-in-chief—her answers demonstrate some level of annoyance. JC also had a tendency during both testimonies to explain her answers when the cross-examination questions did not call for an explanation. While the topics may have been different, what we can tell from the record on appeal is that JC's cross-examination at trial was similar in terms of her level of annoyance and volunteering of explanations. While the military judge did not need to direct JC to answer questions during her trial testimony, we will not speculate that he would have needed to do so if a few additional questions had been allowed. It appears to us that JC only needed to be told once to directly answer the questions and she did so thereafter. We are satisfied that the court members would not have received a different impression of JC if the Defense had been allowed to ask the additional cross-examination questions.

Considering all of the circumstances of this case, reasonable court members would not have received a significantly different impression of JC's recall of consensual sexual behaviors, memory gaps, or credibility if the line of questioning had been allowed. *See United States v. Collier*, 67 M.J. 347, 352 (C.A.A.F. 2009) (quoting *Van Arsdall*, 475 U.S. at 680). We see no reasonable possibility that JC would have testified that she consented to any of the behaviors, which means she would have testified that she did not recall them or they did not happen. If JC did not recall them, the evidence could not be considered as substantive evidence without Appellant's trial testimony, just as was conceded by the Defense during motion practice. If JC testified the events did not happen, this would not have helped Appellant substantively and we do not believe attempts to impeach JC with her motion testimony would have given the members a different impression of her credibility. Under either scenario, the members' impression of the quality of JC's memory and whether she was a credible witness would not have changed with the additional cross-examination or possible further impeachment questioning on the quality of her

memory. There was abundant evidence of JC's memory gaps, even close-in-time to the penetration, and the Defense could and did argue its selective memory theory. Similarly, we see little difference in JC's credibility and manner of testimony once the military judge interceded during cross-examination on the motion. While the evidence in this case was not overwhelming to support a conviction, we are convinced that the answers to the additional cross-examination, if allowed, would not have left the members with a significantly different impression of JC's recall of consensual sexual behaviors, memory gaps, and credibility. Therefore, the limitations on JC's cross-examination which we have assumed were erroneous were harmless beyond a reasonable doubt.

## F. Post-Trial and Appellate Delay

### 1. Additional Background

Appellant's court-martial concluded on 7 December 2018. The convening authority took action 194 days later on 19 June 2019. Appellant's case was docketed with our court on 1 July 2019. Our court did not render a decision within 18 months of the docketing date.

### 2. Law

In *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), our superior court established a presumption of facially unreasonable post-trial delay when the convening authority does not take action within 120 days of trial. *Moreno* also established a presumption of facially unreasonable delay when a Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142.

When there are facially unreasonable delays in post-trial and appellate processing, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id*. at 136 (citing *Barker*, 407 U.S. at 533).

However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have the authority to consider whether relief for excessive post-trial or appellate delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). We consider the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

### 3. Analysis

Regarding post-trial delay between conviction and convening authority action, there is a facially unreasonable delay. The convening authority exceeded the 120-day standard by 74 days. The length of the delay weighs in favor of Appellant.

The reasons for the delay are largely attributed to the time it took to transcribe, review, and authenticate the record of trial. This is a 14-volume record with 2,046 pages of transcript. The parties completed their review of the transcript by the end of March 2019, and the military judge authenticated the record on 3 May 2019. On 31 May 2019, the staff judge advocate's recommendation was signed. The Defense submitted clemency on 14 June 2019. The addendum to the staff judge advocate's recommendation was signed on 19 June 2019, the same day the convening authority took action. The reasons for the delay weigh only slightly in Appellant's favor.

Appellant made a demand for speedy post-trial processing in his clemency submission on day 188. This factor weighs slightly in Appellant's favor. We note that the Government completed post-trial processing six days after this demand and docketed the record of trial with our court well within 30 days of the convening authority's action.

Regarding prejudice from post-trial delay, Appellant received no confinement so there is no oppressive incarceration. *See Moreno*, 63 M.J. at 139. Appellant did not identify specific anxiety and concern, except to state in his clemency submission that he was having difficulty obtaining a national security job due to his mandatory dishonorable discharge. *Id*. We find no particularized anxiety or concern that is different from others awaiting convening authority action. Finally, as Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id*. at 140. Consequently, Appellant has not shown prejudice, and there is no due process violation as the delay is not so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362.

Considering all of the factors together in our review of this case, we do not find a violation of Appellant's due process right to timely post-trial processing.

We also find no Article 66(c), UCMJ, relief is appropriate for post-trial delay. *See Tardif*, 57 M.J. at 224. We considered the factors in *Gay*, 74 M.J. at

744, and note that we can see good faith efforts to conduct post-trial processing in a timely manner in a fully contested case with a lengthy transcript and many motions and rulings. The delay does not involve substantial harm to Appellant, prejudice to the interests of justice or discipline, or an erosion of our ability to conduct appellate review. We see no reason to reduce an otherwise appropriate sentence imposed by the court members and approved by the convening authority.

Turning to appellate delay, Appellant requested eight enlargements of time to file his brief, all of which we granted over the Government's opposition. The assignment of error was filed on 13 May 2020. The Government answered on 29 June 2020. We granted Appellant an enlargement of time to file a reply brief which was submitted on 20 July 2020. Appellant has not requested speedy appellate processing.

We apply the same legal principles to appellate delay as in post-trial delay. The delay in rendering this decision after 1 January 2021 is presumptively unreasonable. The reason for the appellate delay is twofold. First, Appellant needed additional time to submit his briefs. Second, this appeal involved a large record of trial, lengthy filings by the parties, and numerous issues which required careful consideration by our court. We find no oppressive incarceration, particularized anxiety or concern, or impairment of the Defense at a rehearing. Appellant has not claimed prejudice, and we find none. Additionally, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for appellate delay is appropriate even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

J. JOHNSON, Chief Judge (dissenting).

Because I am not convinced the evidence proves Appellant's guilt beyond a reasonable doubt, I must respectfully dissent. *See United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

I agree with my colleagues in the majority that the evidence meets the "very low threshold" for legal sufficiency to sustain a conviction. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019). In particular, I agree there was abundant evidence that, at the time and place alleged, Appellant penetrated JC's vulva with his penis. Moreover, JC's testimony regarding the alleged assault, if accurate, plainly supports finding that JC did not consent and that Appellant could not reasonably have believed she consented. However, the Government's case relied very heavily on JC's testimony, and in my view several factors significantly undermined the reliability of that testimony, leaving reasonable doubt as to Appellant's guilt. I address several of these factors below.

## A. Impairment and Memory Lapses

Witness testimony and scientific evidence both indicate JC was significantly intoxicated on the night of the alleged sexual assault. Moreover, according to JC's own testimony she had significant lapses in memory both before and during portions of the alleged assault. Although not fatal, both her impairment and her admitted memory lapses in themselves have some effect on her potential reliability as a witness before we reach additional considerations such as contradictions, inconsistencies, and motives.

More specifically with regard to memory, it is notable that JC testified she remembered being alone in her room, preparing to go to sleep, after she professed to have an extended gap in her memory after ordering beers for the others on the patio. JC testified that she did not remember telling LC in the elevator that she was going to sleep in LC's room. She did not remember going to LC's room twice with Appellant to ask for her access badge. She did not remember how the beer bottle came to be next to her bathroom sink. Yet, at a time when Dr. GJ estimated that her blood alcohol content was still very high, she testified that she had a clear memory of being alone in her room preparing for bed *before* Appellant knocked on the door. There is no apparent explanation for this abrupt resumption of lucid memory, and other factors raise questions as to whether her memory was genuine.

## B. Inconsistencies and Contradictions

Notably, shortly after the alleged assault, JC provided a somewhat different version of events. JC told Dr. K that Appellant "followed" her to her hotel room, and apparently did not mention being interrupted as she prepared for bed. JC told SA LJ a third, apparently inconsistent version, that she was "already asleep" when Appellant knocked on her door. Although it is possible the testimony of Dr. K and SA LJ did not accurately reflect what JC said at the time, I find these inconsistencies cast some doubt on the reliability of JC's testimony.

Another significant contradiction involves JC's phone. LC testified that Appellant had picked up JC's phone at one point during the evening when JC left it on a table at the patio when she went to the restroom. This testimony is supported by the message Appellant sent at 0338, after the alleged assault, asking for someone to pick up JC's phone at Appellant's room. LC testified SrA CB went and retrieved JC's phone, also after the alleged assault. However, JC specifically testified that before Appellant knocked on her door, she was setting the alarm on her phone. This would be impossible if JC's phone was not returned until after the alleged assault—unless JC was referring to a different phone, of which there is no evidence. This inconsistency in JC's testimony suggests she may have filled in information that she did not actually remember, but which she believed in line with her assumptions as to how she would or should have acted.

I also find significant JC's resistance to acknowledging her belief that she was pregnant prior to traveling to Germany. At trial, JC denied that she had told SSgt CM prior to the trip that she thought she was pregnant. However, SSgt CM testified that JC in fact did so. JC also testified that she did not "recall" telling Dr. K that she believed she was pregnant. This assertion is notable in light of her contradicted claim that she did not tell SSgt CM the same thing, as well as testimony of Mr. HE that JC stated in the ambulance that she was pregnant. One apparent explanation for JC's apparent resistance to acknowledging her belief that she was pregnant might be reluctance to acknowledge behavior that her spouse or others might view as irresponsible, such as excessive consumption of alcohol while pregnant. In a similar vein, there was a noticeable trend in JC's testimony to not remember events that others testified to which portrayed her as acting impulsively or in an otherwise negative light, such as harassing LC or being "very engaged" with the male hotel guests.

Moreover, in addition to the contradiction regarding whether JC was followed, asleep, or preparing for bed noted above, there were other noticeable differences in JC's pretrial accounts of the alleged assault and her testimony. JC did not report to Dr. K any lapses in memory, and she affirmatively told Dr. N that she remembered the "whole event," in marked contrast to the two points at which JC testified she lost consciousness or memory during the alleged assault. Furthermore, Dr. K recorded in her report that JC said she confronted Appellant immediately after the assault, and Appellant responded to the effect that he did not do anything JC did not want to do. This apparently exculpatory statement by Appellant was absent from JC's testimony at trial.

## C. Motive

The fact that JC was married to someone else provides a clear motive for JC to deny or disbelieve that she either consented to sexual activity with Appellant, or behaved in a way that would have caused Appellant to reasonably

believe she consented. However, evidence in this case suggests JC had a particularly strong incentive to deny activity that her spouse TSgt BC would disapprove of, beyond the typical ties of a marital relationship. JC's co-worker and friend SSgt CM testified that she had described how TSgt BC's ex-wife's infidelity affected TSgt BC, and how sensitive JC was to it. In addition, there was evidence that JC and TSgt BC were attempting to have a child after the difficult experience of a recent miscarriage. Furthermore, SSgt CM testified that JC had previously asked him on another trip not to reveal her alcohol consumption to TSgt BC; similarly, on the night of the alleged assault, JC told LC it was "better this way" when JC sent a misleading text to TSgt BC that she was going to sleep rather than staying up drinking and socializing. Taken together, the evidence suggests JC may have had a particularly strong motive to reject a scenario in which excessive alcohol consumption led her into sexual activity with another man which had possibly harmed her pregnancy. This impression is reinforced by the concern JC expressed shortly after the assault that her husband would "think that she's a whore," and her "very peculiar" statement to Mr. HE as soon as he arrived that she "didn't want to do it" because she was "married."

## D. Absence of Corroboration

The memory issues, inconsistencies, contradictions, and questions of motive in JC's testimony might be overcome if there was strong corroborating evidence of Appellant's guilt. However, with respect to the absence of consent or reasonable mistake of fact as to consent, the record does not significantly corroborate JC's account. For example, there is insufficient basis to conclude JC was too intoxicated or otherwise incapable of consenting, and therefore did not consent. Although JC was evidently highly intoxicated at the time of the alleged assault, Dr. GJ testified that individuals with her estimated blood alcohol content would be capable of activities such as engaging in sexual intercourse. Moreover, JC's own account of the alleged assault belies a conclusion that she was incapable of consenting. According to her testimony, JC was aware of her surroundings, able to dress herself and answer her door, and verbally communicated her lack of consent to Appellant.

Moreover, the Government presented no incriminating statements by Appellant or other compelling evidence of consciousness of guilt on his part, other than JC's own testimony. The fact that Appellant appeared "frazzled" and "scared" when he went to SrA CB's room at JC's request was not necessarily indicative of guilt; it was equally consistent with seeking assistance for JC after she had a strong negative emotional reaction following a sexual act that was consensual, or reasonably perceived by Appellant to be consensual. JC's earlier abrupt mood swings in the hotel restroom, observed by both LC and SrA CB, make such a scenario more plausible.

Furthermore, Ms. MO provided expert testimony that JC's full-body examination disclosed none of the marks or injuries that she would have expected and looked for given JC's description of the assault. I acknowledge the presence or absence of injuries, genital or otherwise, is not in itself proof that a sexual act was consensual or nonconsensual. However, that is not the relevant point. The relevant point is that JC gave particular testimony regarding a purported violent encounter that, in Ms. MO's expert opinion, would likely leave marks or injuries in specific areas. The absence of such evidence is not determinative in itself, but coupled with the other factors in this case it further tips the balance toward reasonable doubt.

**E. Conclusion**

I acknowledge that not every consideration weighs in favor of finding Appellant's conviction factually inconsistent. I recognize that the court members were present in the courtroom and observed JC and the other witnesses testify. I further recognize that the evidence need not be "free from conflict" in order to be convincing beyond a reasonable doubt. *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (quoting *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). I also acknowledge various evidentiary points the Government made at trial and on appeal, such as the absence of any prior romantic or sexual relationship between JC and Appellant.

Yet, ultimately the Government's case depended on the reliability of JC's testimony. It is not enough that JC's testimony might be explainable and accurate, or even likely; it must be convincing beyond any reasonable doubt. My esteemed colleagues in the majority correctly note that the court members could have focused on JC's testimony regarding the essential elements of the offense and found it convincing. But in order for us to affirm, we ourselves must find proof beyond a reasonable doubt. My colleagues do so, but I cannot. I need not and do not conclude that JC's testimony was given falsely or in bad faith. However, for the reasons stated above, I am simply not convinced of its reliability beyond a reasonable doubt, and therefore I would find Appellant's conviction factually insufficient.

FOR THE COURT

NATALIA A. ESCOBAR
Deputy Clerk of the Court